UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SHARON LAWRENCE,               :
                               :CIVIL ACTION NO. 3:11-CV-1339
        Plaintiff,       :
                               :(JUDGE CONABOY)
        v.                :
                               :
SCHUYLKILL MEDICAL CENTER    :
EAST, also known as,        :
SCHUYLKILL HEALTH SYSTEM,     :
                               :
        Defendant.       :

---

### MEMORANDUM

Here we consider Defendant's Motion for Summary Judgment (Doc. 23) filed on May 2, 2012. With this motion, Defendant seeks judgement in its favor on all counts of Plaintiff's First Amended Complaint (Doc. 16). Plaintiff's First Amended Complaint contains claims for sex discrimination, sexual harassment-hostile work environment, and retaliation based on the alleged harassment of a coworker and Defendant's response to it. (Doc. 16.) For the reasons discussed below, we conclude Defendant's Motion for Summary Judgment (Doc. 28) is properly granted in part and denied in part.

### I. Background

Plaintiff Sharon Lawrence ("Plaintiff") is a registered nurse who began working at Good Samaritan Hospital on August 13, 2007. (Doc. 27 ¶¶ 1-2.) She is married and is the mother of three children, ages nine, fourteen, and twenty-two. (Doc. 27 ¶ 1.)

Following a merger, Good Samaritan Hospital became known as Schuylkill Medical Center East ("SMCE" "Defendant" "Hospital").

(Doc. 27 at 1 n.3.)  Plaintiff was a float pool nurse working from 11 p.m. to 7 a.m.  (Doc. 27 ¶ 2.)  Float pool nurses can work on all floors of the Hospital without a regular assignment (*id.*) which meant that the Hospital could assign Plaintiff to various locations during her regularly scheduled shift based upon need (Doc. 24 ¶ 2; Doc. 26 ¶ 2).

Plaintiff initially worked five eight-hour shifts per week from 11:00 p.m. to 7:30 a.m.  (Doc. 24 ¶ 3; Doc. 26 ¶ 3.) Plaintiff had trouble with her sleep cycle on this schedule, and the Hospital accommodated her request to change to two twelve-hour shifts and two eight-hour shifts each week.  (*Id.*)  However, Plaintiff also wanted to keep her weekends free and felt that working every-other weekend interfered with her sleep cycle.  (*Id.*) Susan Curry, SMCE Nursing Director at the time, proposed Plaintiff work three, twelve-hour shifts and one, four-hour shift each week, but Plaintiff wanted to work only seven shifts, rather than eight shifts, per two-week pay period.  (*Id.*)  Consequently, Curry again accommodated Plaintiff's desires by allowing her to work three twelve-hour shifts each week and one, eight-hour shift in one week of a two-week pay period.  (*Id.*)  Plaintiff normally worked her twelve-hour shifts from 7:00 p.m. to 7:30 a.m. (Doc. 24 ¶ 6; Doc. 26 ¶ 6.)

Plaintiff's working the eight-hour shift in one week (rather than a four-hour shift each week) resulted in a total of 44 hours

2

for that week and would have entitled Plaintiff to overtime.  (Doc. 24 ¶ 4; Doc. 26 ¶ 4.)  Because Curry could not justify paying Plaintiff overtime to accommodate her schedule, she and Plaintiff agreed Plaintiff would not punch in on the day of her eight-hour shift and four hours would be manually entered into the timekeeping system for each week in the pay period.  (Doc. 24 ¶ 5; Doc. 26 ¶ 5.)  Of the thirty to thirty-five nurses in the float pool, Plaintiff was the only one with this schedule.  (Doc. 24 ¶ 7; Doc. 26 ¶ 7.)

The perpetrator of the workplace harassment underlying this action was co-worker Jeffrey Vaillant who was hired by Defendant as a nurse in March 2009.  (Doc. 27 ¶ 6.)  Nursing Director Curry had hiring responsibility for nurses.  (Doc. 27 ¶ 8.)  Kathleen Garber, an Employment Specialist for SMCE, also met with Vaillant before he was hired.  (Doc. 27 ¶¶ 18-19.)  As part of her review process, Garber received and reviewed a Reference Form from Vaillant's previous employer, Lehigh Valley Hospital ("LVHN").  (Doc. 27 ¶ 20.)  The Reference Form indicated that Vaillant was discharged from his employment at LVHN for violation of Hospital policy. (Doc. 27 ¶¶ 14-15.)  The form also indicated that Vaillant was disciplined on five occasions during the period August 2007 through August 2008, two of which involved inappropriate conduct, sexual harassment, one for which he was suspended in March 2008, and then a second incident in August 2008 involving inappropriate conduct,

3

sexual harassment, for which he was discharged.  (Doc. 27 ¶ 15.)

Garber sent an e-mail to Curry following her interview with Vaillant in which she expressed concern about hiring Vaillant (Doc. 27 ¶ 21), specifically noting that she was hesitant about "what he said about the harassment issue" (Doc. 27-9 at 9).  Curry testified that she did not recall Garber expressing any concern about hiring Vaillant.  (Doc. 17 ¶ 24.)

Curry had reviewed the LVHN Reference Form before hiring Vaillant (Doc. 27 ¶ 31), and she advised SMCE Human Services Director Martin Treasure that there was an allegation of sexual harassment against Vaillant at LVHN (Doc. 27 ¶ 26).  Defendant asserts that the Hospital perceived that Vaillant provided honest and forthright information which addressed these issues.  (Doc. 24 ¶ 12.)

According to Curry, the decision to hire Vaillant was made by herself, Treasure, and SMCE Nurse Managers Carol Demcher and Lynn Morgan.  (Doc. 27 ¶ 32.)  Demcher testified that she interviewed Vaillant but did not know before he was hired about the LVHN sexual harassment charges.  (Doc. 27 ¶ 33.)

Plaintiff asserts that Vaillant began making inappropriate sexual comments to her in June 2009 and they continued through the summer.  (Doc. 27 ¶ 35.)  On August 20, 2009, Plaintiff contacted Curry by telephone to report what she felt was inappropriate conduct by Vaillant. (Doc. 24 ¶ 8; Doc. 26 ¶ 8.)  Plaintiff stated

that, on one occasion, Vaillant asked Plaintiff if her bra and panties matched.  (Doc. 24 ¶ 9; Doc. 26 ¶ 9.)  Plaintiff alleges that she also told Curry about other comments Vaillant had made to her, including asking to kiss her, telling her he thought she was attractive, stating "I love the view" as she stooped down, telling her to divorce her husband because her name would sound better with his last name, and stating "I want to be with you, I want to make love to you."  (Doc. 24 ¶ 10; Doc. 26 ¶ 10.)  Plaintiff also alleges that she told Curry she had heard from coworkers that Vaillant had had a problem at his former Hospital.  (Doc. 24 ¶ 11; Doc. 26 ¶ 11.)

During the August 20, 2009, phone call, Plaintiff told Curry that she had already spoken to Vaillant about the conduct.  (Doc. 24 ¶ 13; Doc. 26 ¶ 13.)  Plaintiff avers that she made the call because her attempts to resolve the problem herself were unsuccessful.  (Doc. 27 ¶ 42.)  Curry recalls repeatedly asking Plaintiff if she wanted Curry to intervene and Plaintiff indicated she did not want Curry to speak to Vaillant but if she needed Curry to do so, she would let her know. (Doc. 24 ¶ 14.)  Plaintiff disputes Curry's recollection, asserting that Curry said she would take care of the situation and speak to Vaillant.  (Doc. 27 ¶ 46; *see also* Doc. 24 ¶ 15; Doc. 26 ¶ 15.)  Plaintiff also informed Curry about another alleged situation involving Vaillant. (Doc. 24 ¶ 16; Doc. 26 ¶ 16.)  On August 7, 2009, Bridgette Schultz, an SMCE

nurse, made a report to Carol Demcher, the nurse manager for the fifth floor or "5 North" unit of the Hospital.  (Doc. 24 ¶ 17; Doc. 26 ¶ 17.)  Schultz told Demcher that she was scratching a mosquito bite inside her uniform top when she heard another nurse, Becky Kessler, state "Jeff, what are you doing?"  (Doc. 24 ¶ 18; Doc. 26 ¶ 18.)  Schultz stated that Vaillant was preparing to take a picture with his camera phone and said that he wanted to take a group picture of the staff to show his wife the beautiful women he worked with.  (Doc. 24 ¶ 19; Doc. 26 ¶ 19.)  Demcher told Schultz she would investigate the incident and that Schultz should notify a supervisor if she felt threatened in any way.  (Doc. 24 ¶ 20; Doc. 26 ¶ 20.)  Defendant asserts Demcher immediately prepared a written report which she submitted to Curry.  (Doc. 24 ¶ 21.)  Plaintiff avers there is an undated unsigned report which Demcher testified she prepared but contends the report was not immediately prepared or immediately given to Curry.  (Doc. 26 ¶ 21.)  Demcher could not verify details of the incident with Kessler.  (Doc. 24 ¶¶ 22-23; Doc. 26 ¶ 22-23.)  Demcher spoke to Vaillant and he admitted to taking a group photo. (Doc. 24 ¶ 24; Doc. 26 ¶ 24.)

Because Demcher confirmed only that Vaillant had been taking a group photo, Demcher determined that any allegation of sexual harassment was unfounded, and she did not recommend that Vaillant be disciplined.  (Doc. 24 ¶ 25; Doc. 26 ¶ 25.)  Plaintiff avers the investigation was incomplete and insufficient because Demcher never

asked Vaillant to show her the pictures on his camera and Demcher never asked who the other nurses were in the supposed group picture.  (Doc. 26 ¶ 25.)

Demcher advised Vaillant that taking pictures in the Hospital was against policy because it could violate patient privacy concerns.  (Doc. 24 ¶ 26; Doc. 26 ¶ 26.)  Defendant avers that Vaillant was instructed not to repeat the conduct and was told that corrective action would be taken if he did, but Plaintiff contends Demcher did not provide any testimony substantiating this averment. (Doc. 24 ¶ 27; Doc. 26 ¶ 27.)  Vaillant did not attempt to take another photo in the Hospital again.  (Doc. 24 ¶ 28; Doc. 26 ¶ 28.)

On the evening of September 6, 2009, the Sunday of Labor Day weekend, Plaintiff reported to Rosellen Frantz, the nursing supervisor on the 3:00 p.m. to 11:00 p.m. shift, that Vaillant stated to her "can I get some fries with that shake," and put his hands on her shoulders.  (Doc. 24 ¶ 29; Doc. 26 ¶ 29.)  Frantz asked Plaintiff to write down what had happened to document her complaint. (Doc. 24 ¶ 30; Doc. 26 ¶ 30.)  Plaintiff asked Frantz to have the police remove Vaillant from the Hospital.  (Doc. 24 ¶ 31; Doc. 26 ¶ 31.)  Frantz told Plaintiff that she should wait for the Hospital administration to investigate the incident when they returned after the Labor Day holiday.  (Doc. 24 ¶ 32; Doc. 26 ¶ 32.)  Plaintiff returned to work and completed her shift. (Doc. 24 ¶ 33; Doc. 26 ¶ 33.)  At the end of her shift, on September 7,

7

2009, Plaintiff made a written report and submitted it to Janet Costa, the nurse supervisor for the 11:00 p.m. to 7:00 a.m. shift. (Doc. 24 ¶ 37; Doc. 26 ¶ 37.)

Two other nurses, Bridgette Schultz and Crystal Novak, also reported to Frantz on September 6, 2009, that Vaillant had made inappropriate comments to them. (Doc. 24 ¶ 34; Doc. 26 ¶ 34.) Frantz placed written statements from these nurses in a locked mailbox for Curry, and, at the end of her shift at 11:00 p.m. on September 6th, called Curry at home to inform her of the complaints. (Doc. 24 ¶ 35; Doc. 26 ¶ 35.)  Curry told Frantz she would investigate the matter and asked Frantz to have everything ready for her when she returned to the office on Tuesday, September 8, 2009.  (Doc. 24 ¶ 36; Doc. 26 ¶ 36.)

First thing on the morning of September 8, 2009, Plaintiff called Curry. (Doc. 24 ¶ 38; Doc. 26 ¶ 38.)  Plaintiff relayed the information in her complaint, and Curry indicated to Plaintiff that she received written statements and would be reviewing them and investigating the situation.  (Doc. 24 ¶ 39; Doc. 26 ¶ 39.) Plaintiff alleges that she also asked Curry how Vaillant would be reprimanded and that Curry stated she could not tell Plaintiff because it would be a HIPAA violation.  (Doc. 24 ¶ 40; Doc. 26 ¶ 40.)

Curry told Plaintiff that there would be sexual harassment training from the ground up.  (Doc. 24 ¶ 42; Doc. 26 ¶ 42.)  Curry

8

also asked Plaintiff what she meant by the last line of her written statement, "I made Sue Curry aware of this problem." (Doc. 24 ¶ 43; Doc. 26 ¶ 43.)  Plaintiff indicated she meant that she had shared her concerns with Curry in the past. (Doc. 24 ¶ 44; Doc. 26 ¶ 44.)  Defendant asserts that Curry was concerned that Plaintiff's statement incorrectly implied that Curry had failed to act on Plaintiff's prior report when Plaintiff had repeatedly declined Curry's offer to intervene. (Doc. 24 ¶ 45.)  Plaintiff disputes Curry's assessment that Plaintiff had declined Curry's offer to intervene when they spoke on August 20, 2009. (Doc. 26 ¶ 45.)

On the morning of September 8, 2009, Curry and Demcher began investigating the complaints, including interviews with Schultz and Novak. (Doc. 24 ¶¶ 46-47; Doc. 26 ¶¶ 46-47.)  When information indicated that Vaillant may have made inappropriate comments to another nurse, Melissa Shirey, Demcher also spoke to her on September 8, 2009, and documented the interview. (Doc. 24 ¶ 48; Doc. 26 ¶ 48.)  Defendant asserts Shirey stated that Vaillant had made comments to her but she had not reported them because she did not feel threatened. (Doc. 24 ¶ 49.)

On September 8, 2009, Curry also called HR Director Treasure to inform him of the allegations. (Doc. 24 ¶ 50; Doc. 26 ¶ 50.)  Treasure asked Curry to ensure that written statements were obtained and that an investigation was conducted as soon as possible. (Doc. 24 ¶ 51; Doc. 26 ¶ 51.)

Curry and Demcher also met with Vaillant on September 8, 2009. (Doc. 24 ¶ 52; Doc. 26 ¶ 52.)  Curry questioned Vaillant about the complaints and, with one exception, Vaillant acknowledged that he made the comments at issue.  (Doc. 24 ¶¶ 53-54; Doc. 26 ¶¶ 53-54.) Vaillant stated that such comments were "a two-way street" and part of the usual banter on 5 North. (Doc. 24 ¶ 55; Doc. 26 ¶ 55.) Defendant states that Vaillant noted several examples of such comments by female nurses on the unit.  (Doc. 24 ¶ 56.)  Plaintiff avers the "banter" referred to did not involve her or the other nurses who complained about Vaillant's conduct.  (Doc. 26 ¶ 56.) Curry told Vaillant that such conversations were unprofessional and inappropriate, that all such communication must stop immediately, and that any such communication from any employee should be reported.  (Doc. 24 ¶ 57; Doc. 26 ¶ 57.)  Curry also told Vaillant that the investigation would continue.  (Doc. 24 ¶ 58; Doc. 26 ¶ 58.)

After meeting with Vaillant, Defendant reports that Curry spoke to Michelle Ebling, a nurse who was present during one of the examples of "banter" Vaillant had cited.  (Doc. 24 ¶ 59; Doc. 26 ¶ 59.)  Defendant also reports that Ebling confirmed Vaillant's story and commented "I guess we all have to clean up our act a little bit."  (Doc. 24 ¶ 60.)

Curry shared the information she had gathered with Treasure and Chief Nursing Officer Darnell Furer. (Doc. 24 ¶ 61; Doc. 26 ¶

61.)  Curry testified that she followed up with the 5 North staff again to ensure that there was not further inappropriate conversation on the unit. (Doc. 24 ¶ 62.)

Based on the investigation, Curry and Treasure determined that Vaillant had engaged in sexual harassment. (Doc. 24 ¶ 63; Doc. 26 ¶ 63.)  Curry, Treasure, and Furer determined that Vaillant would be given a final written warning with a very strong message that if any further behavior of this nature occurred, he would be terminated.  (Doc. 24 ¶ 64; Doc. 26 ¶ 64.)

On September 14, 2009, Plaintiff called Curry again.  (Doc. 24 ¶ 65; Doc. 26 ¶ 65.)  Plaintiff asked Curry how the investigation was going to be resolved.  (Doc. 24 ¶ 66; Doc. 26 ¶ 66.)  Although the decision regarding Vaillant's discipline had been made at this point, it had not yet been communicated to Vaillant.  (Doc. 24 ¶ 67; Doc. 26 ¶ 67.)  Plaintiff alleges Curry stated that she could not reveal Vaillant's discipline because of HIPAA.  (Doc. 24 ¶ 69; Doc. 26 ¶ 69.)  Plaintiff demanded to know if Vaillant was still employed at the Hospital and Curry indicated he was.  (Doc. 24 ¶ 70; Doc. 26 ¶ 70.)  Plaintiff stated that she was not pleased with the way things were being handled.  (Doc. 24 ¶ 71; Doc. 26 ¶ 71.)  Plaintiff stated that Vaillant should be fired.  (Doc. 24 ¶ 72; Doc. 26 ¶ 72.) Plaintiff also indicated that she did not trust Curry, Demcher, or the Hospital to handle the situation appropriately.  (Doc. 24 ¶ 73; Doc. 26 ¶ 73.)  Plaintiff states she

11

told Curry she could not trust her because Lawrence and Schultz had reported Valliant's misconduct in August and nothing was done to discipline him, and if something had been done previously, the September 6th incidents would not have happened.  (Doc. 17 ¶ 90.) Defendant asserts Curry responded to the lack of trust comment by telling Plaintiff that if she felt strongly that she could not trust the Hospital, then perhaps it is not the place of employment for her.  (Doc. 24 ¶ 74.)  Plaintiff asserts that Curry said "maybe the Hospital is not the place of employment for you" but not in the context Defendant alleges.  (Doc. 26 ¶ 74.)  In her deposition testimony, Plaintiff indicates Curry's statement regarding employment at SMCE was made following Plaintiff's statement that she would contact the Hospital president rather than the individual suggested by Curry.  (Lawrence Dep. 228:23-229:5 (Doc. 27-2 at 29).)  Plaintiff stated that she was going to call John Simodejka, President and CEO of Schuylkill Health.  (Doc. 24 ¶ 75; Doc. 26 ¶ 75.)  Curry reports she encouraged Lawrence to contact the next appropriate person up the chain of command if she was unhappy with the decision made by her and Demcher.  (Doc. 24 ¶ 76.)

On September 14, 2009, Plaintiff called Simodejka's office and left a message with his assistant.  (Doc. 24 ¶ 77; Doc. 26 ¶ 77.) Simodejka's assistant forwarded the information to Treasure.  (Doc. 24 ¶ 78; Doc. 26 ¶ 78.)   On September 15, 2009, Treasure returned Plaintiff's call and left a message for her.  (Doc. 24 ¶ 79; Doc.

26 ¶ 79.)  Plaintiff returned Treasure's call later that day.
(Doc. 24 ¶ 80; Doc. 26 ¶ 80.)  Plaintiff and Treasure had a lengthy
conversation during which Plaintiff recounted the events involving
Vaillant.  (Doc. 24 ¶ 81; Doc. 26 ¶ 81.)  Plaintiff also expressed
to Treasure that she did not want to work with Vaillant.  (Doc. 24
¶ 82; Doc. 26 ¶ 82.)

Defendant asserts Vaillant worked the 3:00 to 11:00 p.m. shift
and was assigned only to the fifth floor of the Hospital.  (Doc. 24
¶ 83.)  Plaintiff agrees Vaillant was assigned to the fifth floor
but adds that is not the only place where Vaillant worked: when the
sixth floor had nursing shortages, nurses were pulled from the
fifth floor to work on the sixth floor.  (Doc. 26 ¶ 83.)  Plaintiff
objected to working anywhere on the same floor of the building as
Vaillant.[1]  (Doc. 24 ¶ 84.)  Treasure told Plaintiff the Hospital
could not guarantee she would not work with Vaillant, but that he
would look into the matter with the nursing department.  (Doc. 24 ¶
85; Doc. 26 ¶ 85.)

On September 16, 2009, Curry issued Vaillant a final written
warning.  (Doc. 24 ¶ 86; Doc. 26 ¶ 86.)  The warning noted that a
thorough investigation had been made regarding complaints about
sexually harassing comments and instructed Vaillant that
"[e]ffective[] immediately there must be complete cessation of all
types of such communication by you to all coworkers."  (Doc. 24 ¶

_____

[1] Plaintiff did not respond to this averment.

13

87; Doc. 26 ¶ 87.)  The final written warning referred to an attached copy of the Hospital's sexual harassment policy and warned Vaillant that any "[f]ailure to follow our rules and regulations will lead to the immediate termination of our employment relationship."  (Doc. 24 ¶ 88; Doc. 26 ¶ 88.)  Treasure testified that Curry and himself determined the discipline to be given to Vaillant and he arrived at that decision in the belief that, while allegations were serious and the comments were made and there may have been one instance of touching, the fact that Vaillant admitted to the complaints and the fact that Curry had informed him she felt Vaillant understood the seriousness of them, a written warning would be appropriate.  (Doc. 27 ¶¶ 115-116.)

Defendant asserts there is no evidence that Vaillant sexually harassed any coworker, including Plaintiff, after receiving the final written warning and never again said anything offensive to Plaintiff.  (Doc. 24 ¶¶ 90-91.)  Plaintiff contests this assessment based on a complaint she lodged on September 30, 2009, and a complaint lodged at an unspecified time by Lynette, a respiratory therapist who complained to Night Supervisor Yeager that Vaillant had sexually harassed her.[2]  (Doc. 24 ¶ 90.)

Following the issuance of the final written warning, Curry

---

[2]  Details of Plaintiff's September 30, 2009, incident are set out later in the text.  The record reflects that Lynette withdrew her complaint against Vaillant.  (Heather Weicicoskie Dep. 45:4-6 (Doc. 27-11 at 13).)

followed up with the nurses on the 5 North unit, who reported that they had no further issues with Vaillant and were not concerned for their safety.  (Doc. 24 ¶ 92; Doc. 26 ¶ 92.)  Treasure testified that, after the issuance of the final written warning, "the sexual harassment had stopped, which was the objective."  (Doc. 24 ¶ 93.) Plaintiff disputes this for the reasons set out above, adding that Vaillant also subsequently engaged in similar conduct with a patient, inappropriately touching one of his patients in a sexually suggestive way.  (Doc. 26 ¶ 93.)

On September 16, 2009, Treasure called Plaintiff and left a message asking her to call him.  (Doc. 24 ¶ 94; Doc. 26 ¶ 94.)  He also called Frantz to find out whether Vaillant was working that night because of what Plaintiff had asked Treasure during their previous conversation.  (Doc. 24 ¶ 95; Doc. 26 ¶ 95.)  Treasure asked Frantz to let Plaintiff know that Vaillant was working that night.  (Doc. 24 ¶ 95; Doc. 26 ¶ 95.)  When Plaintiff arrived for her shift on September 16, 2009, Frantz informed Plaintiff that Vaillant was working that night.  (Doc. 24 ¶ 96; Doc. 26 ¶ 96.) Plaintiff subsequently called Treasure on September 16, 2009, expressing both her displeasure that Vaillant had not been terminated and her opinion that Vaillant was not a good nurse. (Doc. 24 ¶ 97; Doc. 26 ¶ 97.)

On September 18, 2009, Lisa Schetrum, patient coordinator, informed Plaintiff that, because of changes to the Kronos

15

timekeeping system, as of October 4, 2009, Plaintiff's eight-hour shift could no longer be manually entered so as to avoid overtime. (Doc. 24 ¶ 98.)  Plaintiff adds that this assertion is denied because Treasure advised her that there was no change in the new billing system which would necessitate a scheduling change for Lawrence.  (Doc. 26 ¶ 98.)  The changes consisted of upgrades made to the existing Kronos timekeeping system.  (Doc. 24 ¶ 99; Doc. 26 ¶ 99.)

The changes to the Kronos system were applicable to all employees, not just Plaintiff.  (Doc. 24 ¶ 100; Doc. 26 ¶ 100.) Defendant avers that the Hospital offered to allow Plaintiff to split the eight-hour shift into two four-hour shifts to be worked one in each week during any hours of Plaintiff's choosing.  (Doc. 24 ¶ 101.)  Plaintiff adds that the schedule offered would require her to work one additional day per pay period to work the same number of hours as before and citations to her testimony do not establish that Plaintiff could work any day of her choosing.  (Doc. 26 ¶ 101.)  Plaintiff chose not to work a second four-hour shift.[3] (Doc. 24 ¶ 102.)  Plaintiff claims that she chose not to work a second four-hour shift to reduce the chance she might work with Vaillant.  (Doc. 24 ¶ 103; Doc. 26 ¶ 103.)  However, Plaintiff chose to continue working the same schedule even after Vaillant's employment at the Hospital ended.  (Doc. 24 ¶ 104; Doc. 26 ¶ 104.)

---

[3]  Plaintiff does not respond to this averment.

16

Plaintiff also claims that Curry admitted at her deposition
that her instruction to Plaintiff to work an eight-hour shift and
fill out a time slip manually to avoid receiving overtime pay was a
practice which violated the Hospital's policy by not appropriately
reporting hours worked.  (Doc. 27 ¶ 159.)  Regarding changing
Plaintiff's hours manually, Plaintiff avers that Curry confirmed at
her deposition that she was willing to violate the Hospital's
policy before Plaintiff reported the sexual harassment but not
after and Curry never went to anyone to see if there was a way to
accommodate her previous schedule.  (Doc. 27 ¶¶ 161-62.)

On September 19, 2009, Plaintiff called Treasure and stated
that she felt the "change" in her schedule was retaliatory.  (Doc.
24 ¶ 105; Doc. 26 ¶ 105.)  In her deposition, when asked why she
believed the schedule change was retaliatory, Plaintiff answered:
"Because I was pursuing all of my options of trying to have an
issue, my concerns resolved."  (Doc. 24 ¶ 106; Doc. 26 ¶ 106.)
Plaintiff alleges that Treasure stated the schedule change "sounds
like retaliation."  (Doc. 24 ¶ 107; Doc. 26 ¶ 107.)  Defendant adds
that Treasure did not make this statement and the statement is not
supported by admissible evidence.  (Doc. 24 ¶ 107.)  Plaintiff
claims she asked Treasure "if it was true that there is a new
Kronos system taking effect" and that "he said no, that that Kronos
system has been in effect for some time now."  (Doc. 24 ¶ 108; Doc.
26 ¶ 108.)  Plaintiff and Treasure also talked about setting up a

group meeting to discuss accommodating Plaintiff's desire not to work with Vaillant.  (Doc. 24 ¶ 109; Doc. 26 ¶ 109.)

On September 30, 2009, Curry and Demcher conducted sexual harassment training during the 5 North staff meeting.  (Doc. 24 ¶ 110; Doc. 26 ¶ 110.)  Curry made clear that inappropriate comments were to stop immediately.  (Doc. 24 ¶ 111; Doc. 26 ¶ 111.)

On September 30, 2009, Plaintiff and Treasure spoke again by phone.  (Doc. 24 ¶ 113; Doc. 26 ¶ 113.)  Plaintiff informed Treasure that on that date Vaillant had commented to her that they were wearing the same color uniform and that she felt this was sexual harassment.[4]  (Doc. 24 ¶ 114; Doc. 26 ¶ 114.)  Plaintiff alleges that Treasure agreed that a mere comparison of the color of their clothing was sexual harassment.  (Doc. 24 ¶ 115; Doc. 26 ¶ 115.)  Defendant adds that Plaintiff's allegation is false and is not supported by admissible evidence.  (Doc. 24 ¶ 115.)  Treasure testified that he and Curry concluded that the clothing comments did not rise to the level of sexual harassment.  (Doc. 27 ¶ 125.)

In October 2009, Plaintiff's husband called the Hospital at 2:00 a.m. looking for Plaintiff.  (Doc. 24 ¶ 119; Doc. 26 ¶ 119.) Bridgette Yeager, the nursing supervisor for the 11:00 p.m. to 7:00 a.m. shift, answered the phone and told Plaintiff she had a phone call from her husband.  (Doc. 24 ¶¶ 118-119; Doc. 26 ¶¶ 118-119.)

---

[4] The record reflects the date of the alleged comment was September 30, 2009.  Both parties cite incorrect dates.

After taking the phone call, Plaintiff told Yeager she had to leave because there was an emergency at home. (Doc. 24 ¶ 119; Doc. 26 ¶ 119.) Yeager stated, "F-ing men drive me crazy. And what the F are you going to do about it." (Doc. 24 ¶ 119; Doc. 26 ¶ 119.)

In October 2009, other nurses told Plaintiff that Yeager said she had confronted Plaintiff and told Plaintiff to "shut [her] F-ing mouth." (Doc. 24 ¶ 120; Doc. 26 ¶ 120.) That confrontation never actually occurred. (*Id.*) Plaintiff told Schetrum and Demcher what the other nurses had told her and that the incident did not happen. (*Id.*) Plaintiff asked Schetrum to convey the information to Curry. (*Id.*) Plaintiff also asked for a meeting between herself, Curry, Schetrum, Demcher, and Yeager. (*Id.*) Schetrum conveyed the information to Curry. (Doc. 24 ¶ 121; Doc. 26 ¶ 121.) Defendant asserts that Curry discussed the issue with Yeager, and concluded that, while profanity had been used by Yeager, it was not directed at Plaintiff. (Doc. 24 ¶ 122.) Plaintiff denies this was an accurate conclusion. (Doc. 26 ¶ 122.) The meeting requested by Plaintiff did not occur because of difficulties scheduling the meeting with all of the attendees requested by Plaintiff. (Doc. 24 ¶ 123; Doc. 26 ¶ 123.)

Between September 16, 2009, and November 1, 2009, Plaintiff and Vaillant did not work on the same floor of the Hospital at the same time. (Doc. 24 ¶ 124; Doc. 26 ¶ 124.) On November 1, 2009, Plaintiff was assigned to work on the fifth floor of the Hospital

because the unit was very busy that night.  (Doc. 24 ¶ 125; Doc. 26 ¶ 125.)  Plaintiff refused to work anywhere on that 43-bed unit. (Doc. 24 ¶ 126; Doc. 26 ¶ 126.)  Frantz re-assigned Plaintiff to the emergency room.  (Doc. 24 ¶ 127; Doc. 26 ¶ 127.)

When Plaintiff received the schedule which had her working on the same floor as Vaillant, she became very upset and sought medical treatment.  (Doc. 27 ¶ 137.)  Plaintiff's doctor advised her to take a leave of absence.  (Doc. 27 ¶ 137.)  Plaintiff was out of work for approximately two weeks "as the thought of putting herself in a dangerous situation in a hyper vigilant state emotionally and mentally caused her great fear."  (Doc. 27 ¶ 137.) Plaintiff's primary care physician also referred her to a psychologist, Dr. Allan Rodgers (Doc. 24 ¶ 130; Doc. 24 ¶ 130; Doc. 27 ¶ 138).  Plaintiff first saw Dr. Rodgers on November 6, 2009, and he prescribed Zoloft, a medication she had not taken before. (Doc. 27 ¶ 138, 140.)  Dr. Rodgers classified Plaintiff as a somewhat "obsessive person," described as a person who "likes order, likes to do things rights, has a degree of perfectionism and takes a great deal of pride in what they do."  (Doc. 27 ¶ 143.) Plaintiff continued to treat with Dr. Rodgers through November 11, 2011.  (Doc. 27 ¶ 147.)

In early November 2009, Plaintiff retained an attorney, and on November 16, 2009, filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  (Doc. 24 ¶ 128; Doc.

26 ¶ 128.)  Plaintiff attempted to convince Schultz to file an EEOC charge, but Schultz told Plaintiff she did not want any involvement in that and she was comfortable with what was happening at the Hospital.  (Doc. 24 ¶ 129; Doc. 26 ¶ 129.)

On November 19, 2009, Plaintiff met with Curry, Treasure, and Human Resources Manager, Thomas McPhillips, regarding her work assignments.  (Doc. 24 ¶ 131; Doc. 26 ¶ 131.)  Plaintiff was told that the Hospital would attempt to accommodate her desire not to work on the same floor as Vaillant, but that, given the small size of the facility and the needs of the nursing units, they could not guarantee that Plaintiff would never be on the same floor as Vaillant.  (Doc. 24 ¶ 132; Doc. 26 ¶ 132.)  Plaintiff was also told that there could be potentially serious consequences if she refused to perform her assignment.  (Doc. 24 ¶ 133; Doc. 26 ¶ 133.)  Curry offered Plaintiff a permanent position on the 6 North unit on the sixth floor of the Hospital.  (Doc. 24 ¶ 134; Doc. 26 ¶ 134.) Plaintiff refused that alternative.  (Doc. 24 ¶ 135; Doc. 26 ¶ 135.)  Plaintiff claims that she was uncomfortable with this alternative because, if the 5 North unit was fully staffed and the 6 North unit was short, Vaillant might be asked to temporarily cover work on the sixth floor.  (Doc. 24 ¶ 136; Doc. 26 ¶ 136.) Plaintiff adds that her testimony establishes that there were in fact occasions when Vaillant had been relocated to the sixth floor. (*Id.*)

21

Also on November 19, 2009, Plaintiff was scheduled to work on 5 North at 11:00 p.m., which is when Vaillant's shift at that location ended.  (Doc. 24 ¶ 137; Doc. 26 ¶ 137.)  Rather than listen to the taped report on 5 North, Plaintiff listened to it on another floor to avoid contact with Vaillant, and did not report to the fifth floor until Vaillant had physically left.  (Doc. 24 ¶ 137; Doc. 26 ¶ 137.)

Following the issuance of the final written warning to Vaillant, Plaintiff never again worked on the fifth floor of the Hospital while Vaillant was working on that floor.  (Doc. 24 ¶ 138; Doc. 26 ¶ 138.)

During the relevant time period at the Hospital, the nursing staff going off-shift would tape-record audio reports regarding patients for the oncoming staff to listen to at the beginning of their shift.  (Doc. 24 ¶ 139; Doc. 26 ¶ 139.)  If Plaintiff was assigned to 5 North at 11:00 p.m., following Vaillant's shift, staff would bring the tape recorders to a different floor of the Hospital where Plaintiff would listen to report until Vaillant had physically left the building.  (Doc. 24 ¶ 140; Doc. 26 ¶ 140.)

On January 27, 2010, the Hospital became aware of allegations that Vaillant had been involved in a romantic relationship with a woman that began while she was a patient.  (Doc. 24 ¶ 141; Doc. 26 ¶ 141.)  Vaillant denied many of the allegations.  (*Id.*)  However, the Hospital determined that he would be terminated based on the

allegations and Vaillant's prior conduct.[5]   (*Id.*)

On February 10, 2010, McPhillips contacted Vaillant to discuss this decision, and Vaillant resigned.  (Doc. 24 ¶ 142; Doc. 26 ¶ 142.)  Had Vaillant not resigned, he would have been terminated. (Doc. 24 ¶ 143; Doc. 26 ¶ 143.)

In April 2010, Plaintiff received her last evaluation from the Hospital.  (Doc. 24 ¶ 144; Doc. 26 ¶ 144.)  Plaintiff believes the evaluation was fair and not retaliatory in any way.  (Doc. 24 ¶ 145; Doc. 26 ¶ 145.)

In September 2010, Plaintiff discussed changing jobs with her psychologist. (Doc. 24 ¶ 146; Doc. 26 ¶ 146.)  In October 2010, Plaintiff was considering ending her employment at the Hospital and examining other employment options.  (Doc. 24 ¶ 147; Doc. 26 ¶ 147.)  On November 5, 2010, Plaintiff met with her therapist and told him that she was considering other employment opportunities. (Doc. 24 ¶ 148; Doc. 26 ¶ 148.)  In November 2010, Plaintiff began applying for a new job at multiple places, including Bayada Nurses. (Doc. 24 ¶ 149; Doc. 26 ¶ 149.)  Plaintiff began her orientation with Bayada Nurses in December 2010.  (Doc. 24 ¶ 150; Doc. 26 ¶ 150.)

On December 22, 2010, Plaintiff sent an e-mail to Treasure and McPhillips which stated that, during her overnight shift between

---

[5] Plaintiff details Vaillant's conduct with the patient, asserting that Defendant misstates the nature of the conduct. (Doc. 26 ¶ 141.)

December 19 and 20, 2010, she was working in the ICU when Yeager
came into the unit and "walked over to my co-worker Diane Barlow RN
and whispered into her ear, 'You better not lay your head down on
the table when Sharon Lawrence RN is working because she will
report you for sleeping and she will try to have you fired.'"
(Doc. 24 ¶ 151; Doc. 26 ¶ 151.)   Barlow later told Plaintiff what
Yeager said.  (Doc. 24 ¶ 152; Doc. 26 ¶ 152.)   Plaintiff's e-mail
alleges that Yeager's statement was defamatory and retaliatory.
(Doc. 24 ¶ 153; Doc. 26 ¶ 153.)   Plaintiff testified that this
event was when "I knew I could not take it anymore" and had to
resign from the Hospital.   (Doc. 24 ¶ 154; Doc. 26 ¶ 154.)

    McPhillips responded to Plaintiff that he would look into her
complaint.  (Doc. 24 ¶ 155; Doc. 26 ¶ 155.)   McPhillips obtained
written statements from Barlow and Yeager regarding the event.
(Doc. 24 ¶ 156; Doc. 26 ¶ 156.)   Barlow wrote that, on the night in
question, she was trying to stay warm by leaning on a desk in front
of a computer vent which blows warm air, when Yeager entered the
room and whispered to her, "Do not put your head down when Sharon
is here."  (Doc. 24 ¶ 157; Doc. 26 ¶ 157.)   Yeager wrote the
following: she entered the ICU and saw Barlow sitting at a desk
with her head down and her hands in front of her face next to a
computer; she told Barlow she was not allowed to lay her dead down
on the desk; Barlow replied that she was trying to keep warm by
keeping her face and hands by the hot air blowing out of the

24

computer; she told Barlow that "it looks bad when you have your head down at the desk, especially when you have other people working back here like [Plaintiff] that doesn't normally work back here. It makes the unit look bad." (Doc. 24 ¶ 158; Doc. 26 ¶ 158.) McPhillips attempted to follow up with Plaintiff regarding the written statements but was unable to get Plaintiff to speak to him. (Doc. 24 ¶ 159; Doc. 26 ¶ 159.)

On January 11, 2011, Plaintiff called the Hospital to let them know she was running late due to a snow storm, and was told to start doing admissions work when she arrived. (Doc. 24 ¶ 160; Doc. 26 ¶ 160.) Later that evening, Plaintiff asked a supervisor where she would be assigned from 11:00 p.m. to 7:00 a.m. (*Id.*) The supervisor was not sure because she was waiting to see if other staff called off due to the snow. (*Id.*) At about 9:45 p.m., the supervisor told Plaintiff to continue doing admissions through the rest of her shift. (*Id.*) However, at about 11:30 p.m., a coworker called Plaintiff and told her that she had been assigned to work as a nursing assistant. (*Id.*)

A nursing assistant, also called a caregiver, supports a nurse in providing patient care. (Doc. 24 ¶ 161; Doc. 26 ¶ 161.) If a caregiver calls off work and more nurses are present than caregivers, a nurse is temporarily assigned to cover caregiver duty. (Doc. 24 ¶ 162; Doc. 26 ¶ 162.) Nurses other than Plaintiff were also assigned the caregiver role. (Doc. 24 ¶ 163; Doc. 26 ¶

163.)  Some nurses ask to be assigned the caregiver role.  (Doc. 24 ¶ 164; Doc. 26 ¶ 164.)  A nurse assigned to caregiver duty is paid the same as when working her regular nursing duty.  (Doc. 24 ¶ 165; Doc. 26 ¶ 165.)

Plaintiff testified that the only "inferior work assignment" she believes she received is the temporary assignment to caregiver duty given by Yeager for part of her shift on January 11, 2011. (Doc. 24 ¶ 166; Doc. 26 ¶ 166.)  In her deposition, when asked what was wrong with the caregiver assignment, Plaintiff stated:

> Well, first, we were a half hour into our shift.  Second of all, it was not what was conveyed to me earlier that day, or at quarter to 10.  Third, it was my coworker telling me this.  And fourth, Bridget[te Yeager] had expressed displeasure to my fellow workers that I had ruined her Christmas.

(Doc. 24 ¶ 167; Doc. 26 ¶ 167.)

On January 14, 2011, Plaintiff e-mailed Treasure a letter resigning from the Hospital, purportedly because of "the ongoing retaliatory behaviors of management."  (Doc. 24 ¶ 168; Doc. 26 ¶ 168.)  On January 14, 2011, Treasure replied by e-mail, noting that the investigation into Plaintiff's concerns would continue.  (Doc. 24 ¶ 169; Doc. 26 ¶ 169.)

On January 21, 2011, an investigatory meeting was held regarding Plaintiff's December 22, 2010, complaint.  (Doc. 24 ¶ 170; Doc. 26 ¶ 170.)  Plaintiff refused to attend the investigatory meeting.  (Doc. 24 ¶ 171; Doc. 26 ¶ 171.)

On January 21, 2011, Plaintiff filed a second EEOC charge, alleging that the comment made by Yeager on December 20, 2010, and her temporary assignment to caregiver duty for part of her shift on January 11, 2011, were acts of retaliation for her prior complaints about Vaillant.  (Doc. 24 ¶ 172; Doc. 26 ¶ 172.)

On January 26, 2011, Plaintiff began her employment with Bayada Nurses.  (Doc. 24 ¶ 173; Doc. 26 ¶ 173.)

On February 9, 2011, McPhillips sent Plaintiff a letter again asking Plaintiff to meet regarding her December 22, 2010, complaint, but noting that if he did not hear from her within 24 hours, the matter would be closed.  (Doc. 24 ¶ 174; Doc. 26 ¶ 174.) On February 10, 2011, Plaintiff responded to McPhillips by e-mail that she had "already provided you and the facility with all the essential information; therefore I will not be attending the meeting."  (Doc. 24 ¶ 175; Doc. 26 ¶ 175.)

Plaintiff believes she was retaliated against in the following ways: Frantz hung up on her, Demcher would not say good morning to her, Yeager told a male nurse to stay away from her, Curry leered at her on three occasions (Doc. 24 ¶ 176; Doc. 26 ¶ 176), a scheduling change, untimely tuition reimbursement, supervisors ignoring her, other scheduling issues, Supervisor Bridgette Yeager's use of vulgar language towards her, and Yeager's comments about her to other Hospital employees (Doc. 26 ¶ 176).

Defendant posed an interrogatory to Plaintiff, asking her to

identify each and every employee at the Hospital that she believes was treated more favorably than she was due to gender and how each was treated more favorably.  (Doc. 24 ¶ 177; Doc. 26 ¶ 177.) Plaintiff responded only that "Jeffry [sic] Vaillant who committed multiple instances of sexual harassment was not terminated for engaging in repeated instances of sexual harassment."  (Doc. 24 ¶ 178; Doc. 26 ¶ 178.)

Plaintiff filed her Complaint (Doc. 1) on July 19, 2011.  She filed her First Amended Complaint (Doc. 16) on February 15, 2012. The First Amended Complaint contains the following six counts: Count I - Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq., as amended, for Gender/Sex Discrimination; Count II - Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq., as amended, for Sexual Harassment-Hostile Work Environment; Count III - Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq., as amended, for Retaliation; Count IV - Violation of Pennsylvania Human Relations Act, 43 P.S. § 955(A), et seq., for Sex Discrimination; Count V - Violation of Pennsylvania Human Relations Act, 43 P.S. § 955(A), et seq., for Sexual Harassment-Hostile Work Environment; and Count VI - Violation of Pennsylvania Human Relations Act, 43 P.S. § 955(A), et seq., for Retaliation.

As noted previously, Defendant filed Defendant's Motion for Summary Judgment (Doc. 23) on May 2, 2012.  The motion was

accompanied by Defendant's Statement of Material Facts (Doc. 24) and Defendant's Brief in Support of Motion for Summary Judgment (Doc. 25).  On May 14, 2012, Plaintiff filed Plaintiff's Response to Defendant's Statement of Material Facts (Doc. 26), Plaintiff's Statement of Additional Undisputed Material Facts which Preclude Summary Judgment (Doc. 27), and Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Doc. 28).  Defendant filed Defendant's Reply Brief in Support of Motion for Summary Judgment (Doc. 31) on May 31, 2012.  Therefore, this motion is fully briefed and ripe for disposition.

## II. Discussion

### A. Motion for Summary Judgment Standard

Summary judgment is appropriate when the movant demonstrates there is no "genuine issue as to any material fact."  Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson*, 477 U.S.

29

at 248).   In determining whether a genuine issue of fact exists, a court must resolve all factual doubts and draw all reasonable inferences in favor of the nonmoving party.  *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004) (citation omitted).

The initial burden is on the moving party to show an absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citations omitted).  The moving party may meet this burden by "pointing out to the district court [] that there is an absence of evidence to support the nonmoving party's case when the nonmoving party bears the ultimate burden of proof." *Id.* at 325.  The non-moving party may not rest on the bare allegations contained in his or her pleadings, but is required by Federal Rule of Civil Procedure 56 to go beyond the pleadings by way of affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue.  *Id.* at 324.

Where underlying facts are in dispute, the facts are viewed in the light most favorable to the non-moving party.  *Abramson v. William Patterson College of N.J.*, 260 F.3d 265, 267 (3d Cir. 2001) (citing *Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 854 N.1 (3d Cir. 1990).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255.  Therefore,

when evidentiary facts are in dispute, when the credibility of
witnesses may be in issue, or when conflicting evidence must be
weighed, a full trial is usually necessary.

**B. Defendant's Motion for Summary Judgement**

Defendant asserts it is entitled to judgment in its favor on
all claims against it.  (Doc. 25 at 53.)  For the reasons discussed
below, we conclude Defendant is not entitled to judgment in its
favor on Plaintiff's sexual harassment-hostile work environment
claims under Title VII and the PHRA, Counts II and V, and is
entitled to summary judgment on all other claims.[6]

**1.   Sexual Harassment-Hostile Work Environment**

Defendant maintains that Plaintiff's claims for sexual
harassment-hostile work environment under Title VII and the
Pennsylvania Human Relations Act ("PHRA") cannot go forward because
she cannot show the existence of *respondeat superior* liability.
(Doc. 25 at 29-37.)  We disagree.

Title VII makes it unlawful for an employer "to discriminate
against any individual with respect to his compensation, terms,
conditions or privileges of employment, because of such
individual's race, color, religion, sex, or national origin."  42
U.S.C. § 2000e-2(a)(1).  "Hostile work environment harassment

---

[6] Because Pennsylvania courts have construed the protection of
the two acts interchangeably, the same analysis applies to Title
VII and PHRA claims.  *See Huston v. Proctor & Gamble Paper Products
Corp.*, 568 F.3d 100, 104 n.2 (3d Cir. 2009) (citing *Weston v.
Pennsylvania*, 251 F.3d 420, 426 n.3 (3d Cir. 2001)).

occurs when unwelcome sexual conduct unreasonably interferes with a person's performance or creates an intimidating, hostile, or offensive working environment." *Weston v. Pennsylvania*, 251 F.3d 420, 425-26 (3d Cir. 2001) (citing *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 65 (1986)).

The Supreme Court has repeatedly stated that "Title VII does not set forth 'a general civility code for the American workplace.'" *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998)). The Court has also stated that "[a] recurring point in [our] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Clark County School District v. Breeden*, 532 U.S. 268, 271 (2001) (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998) (alterations in *Clark County*). In *Faragher*, the Court noted that properly applied judicial standards for sexual harassment "will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." 524 U.S. at 788 (internal quotation omitted).

To state a claim for discrimination resulting from a hostile work environment, an employee must show that "'(1) the employee suffered intentional discrimination because of his sex, (2) the

32

discrimination was [severe or pervasive][7], (3) the discrimination detrimentally affected the [employee], (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of *respondeat superior* liability.'" *Andreoli v. Gates*, 482 F.3d 641, 643 (3d Cir. 2007) (quoting *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001)).

For the sake of this motion, Defendant does not argue that Plaintiff cannot meet the first four prongs of the test. (Doc. 25 at 29.)  However, Defendant maintains Plaintiff cannot satisfy the fifth prong because she cannot establish employer liability in the face of the prompt and adequate remedial action taken by Defendant upon notice of Plaintiff's complaints of harassment. (Doc. 25 at 29, 31.)

Regarding the fifth prong, *Andreoli* explained that

> [a]n employer will be liable for the harassing conduct of the alleged victim's coworker[8] if the employer was "negligent or

---

[7]   The Third Circuit originally stated this element as "pervasive and regular," but later changed the standard to conform with the Supreme Court's use of the disjunctive "severe or pervasive." *See Jensen v. Potter*, 435 F.3d 444, 449 n.3 (3d Cir. 2006) (*overruled in part on other grounds by Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

[8]   The standard applies where the harasser is not in a supervisory position over the victim. *See*, *e.g.*, *Fornicoia v. Haemonetics Corp.*, 131 F. App'x 867, 871 (3d Cir. 2005) (not precedential). "If supervisors create the hostile environment, the employer is strictly liable though an affirmative defense may be available where there is no tangible employment action." *Jensen*, 435 F.3d at 452 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher*, 524 U.S. at 807-08.)

> reckless in failing to train, discipline,
> fire or take remedial action upon notice of
> harassment." *Bonenberger v. Plymouth Twp.*,
> 132 F.3d 20, 26 (3d Cir. 1997) (citing *Couton
> v. BMW of N. Am., Inc.*, 29 F.3d 103, 106 (3d
> Cir. 1994)).  An employer is negligent if it
> "knew or should have known about the
> harassment, but failed to take prompt and
> adequate remedial action." *Jensen v. Potter*,
> 435 F.3d 444, 453 (3d Cir. 2006) (internal
> quotations omitted).  Even if the remedial
> action does not stop the alleged harassment,
> it is "adequate" if it is "reasonably
> calculated" to end the harassment.  *Id.*
> (quoting *Knabe v. Boury Corp.*, 114 F.3d 407,
> 412-13 (3d Cir. 1997)).[9]
>
> In most cases, the focus will be on the
> timing and nature of the employer's response.
> We have found an employer's actions to be
> adequate, as a matter of law, where
> management undertook an investigation of the
> employee's complaint within a day after being
> notified of the harassment, spoke to the
> alleged harasser about the allegations and
> the company's sexual harassment policy, and
> warned the harasser that the company does not
> tolerate any sexual comments or actions.  *See
> Knabe v. Boury Corp.*, 114 F.3d 407 (3d Cir.
> 1997).

482 F.3d at 644.  The Third Circuit clarified that the showing of

prompt and remedial action is not an affirmative defense; rather it

is a plaintiff's burden to show the defendant did not take such

action.  *Fornicoia*, 131 F. App'x at 871 (citing *Kunin v. Sears

Roebuck and Co.*, 175 F.3d 289, 294 (3d Cir. 1990)).

Defendant maintains "the facts, even when read in the light

---

[9]   *Andreoli* notes that "[a] remedial action that stops the
harassment is adequate as a matter of law."  482 F.3d at 644 n.2
(citing *Knabe*, 114 F.3d at 411 n.8; *Jensen*, 435 F.3d at 453;
*Weston*, 251 F.3d at 427).

most favorable to Plaintiff, irrefutably demonstrate that the Hospital took prompt and adequate remedial action." (Doc. 25 at 31.)  Defendant notes that relevant disputed facts include whether, at the meeting with Curry on August 20, 2009, Plaintiff reported one or more inappropriate comments by Vaillant and whether Plaintiff repeatedly declined Curry's offers to intervene or expected Curry to handle the situation.  (Doc. 25 at 31 n.9.) Defendant cites several cases in support of the assertion that the issuance of a verbal warning nineteen (19) days after Plaintiff's first complaint on August 20, 2009, and the issuance of a strong final warning twenty-seven (27) days after her first complaint preclude liability here (Doc. 25 at 32-34).  Defendant also contends its actions were adequate in that they put an end to the harassment.  (Doc. 25 at 34.)

        Plaintiff responds that "[i]n the unique circumstances of this case, *respondeat superior* liability is established during two distinct periods." (Doc. 28 at 38.)  The first period is from when Vaillant began working at SMCE to August 20, 2009, when Plaintiff first complained to Curry.  (*Id.*)  The second period is the time after Plaintiff's initial report.  (*Id.*)

        We conclude that *respondeat superior* liability is not appropriate for the first time period, but is not precluded as a matter of law during the second.  During the first time period,

Plaintiff did not make any complaints about Vaillant's conduct.[10]
As Defendant points out in its reply brief, Plaintiff's argument
that Defendant should be liable based on its allegedly deficient
interview and reference check policy urges the imposition of
liability not supported by the law of this Circuit or Title VII law
in general.  (Doc. 31 at 7-10.)

    In support of its argument Plaintiff cites only a Tenth
Circuit case, *Griffin v. City of Opa-Locka*, 261 F.3d 1295 (10th Cir.
2001), *cert. denied*, 535 U.S. 1033 (2002).  Plaintiff's
parenthetical notes that in *Griffin*

> Title VII sexual harassment claim upheld
> where the employer had knowledge of an
> employee's sexual harassment prior to hiring
> the employee or where prior acts of sexual
> harassment at another job would be discovered
> with appropriate investigation, supporting
> conclusion that employee would sexually
> harass female employees if hired by
> Defendant.

(Doc. 28 at 40-41.)

    We conclude the parenthetical provided does not accurately
reflect *Griffin's* inquiry and findings, nor does the case support
the proposition for which it is offered.  The discussion in *Griffin*
of whether a city manager's prior acts of sexual harassment at
other jobs were properly considered relates to the municipality's

---

[10]    The *only* report about possible inappropriate conduct was
made by another nurse (Bridgette Shultz) to fifth floor nurse
manager Demcher who investigated the incident and found any
allegation of sexual harassment unfounded.  (Doc. 24 ¶¶ 17-25; Doc.
26 ¶¶ 17-25.)

liability under 42 U.S.C. § 1983 and the application of *Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658, 663 (1978), and *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 411 (1997). *Griffin*, 261 F.3d at 1307, 1313. Thus, the specific questions before the court were whether the prior acts of harassment were admissible to demonstrate *Monell's* municipal custom or policy requirement, 261 F.3d at 1315, and whether they could go to show that the municipal hiring decision reflects deliberate indifference to the risk that violation of a particular constitutional or statutory right would follow the decision under *Bryan County*, 520 U.S. at 1313. As to the latter, *Griffin* stated that in cases where a plaintiff presents a § 1983 claim based on a hiring decision and inadequate screening, the Supreme Court set out the proper standard in *Bryan County*:

> "Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'"

261 F.3d 1313 (quoting *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 411 (1997)).

Here there is not and cannot be a § 1983 claim based on a hiring decision, and the question of the employer's "deliberate

37

indifference" is not pertinent to the Title VII inquiry of whether the private employer's response to an employee's claim of sexual harassment was prompt and adequate.  Therefore, Plaintiff's claim that Defendant is liable for sexual harassment in the period from Vaillant's first day to August 20, 2009, based on a theory of inadequate screening is without merit.[11]

Our conclusion regarding the first time period does not mean that Defendant's knowledge of prior sexual harassment claims is of no significance.  As noted previosly, Defendant would have us find that nineteen (19) days from complaint to investigation and twenty-seven (27) days from complaint to final warning is a prompt response as a matter of law.  (Doc. 31 at 11.)  However, given the facts of this case, we cannot agree.

Defendant maintains that the Third Circuit's decision in *Neely v. McDonald's Corp.*, 340 F. App'x 83 (3d Cir. 2009) (not precedential), precludes liability in this case.  (Doc. 25 at 34.) In *Neely*, the plaintiff provided a written complaint of sexual harassment to the restaurant manager who called her supervisor about the complaint.  The supervisor initiated an investigation and issued a written warning to the offending employee sixteen (16)

---

[11]  Plaintiff does not argue (nor would the facts support) that Defendant's liability during the first time period is based on what it "should have known" in the *Jensen* framework for *respondeat superior* liability.  *Jensen*, 435 F.3d at 453 (employer liability if the employer "knew or should have known about the harassment, but failed to take prompt and adequate remedial action").

days after the initial complaint. 340 F. App'x at 84.  (The

supervisor also had a disciplinary meeting with the offending

employee and scheduled him and Neely on different shifts.  *Id.*)

The Third Circuit concluded the defendant's remedial measure were

prompt and adequate.  *Id.* at 86.

    As noted above, the parties dispute whether Plaintiff told

Curry not to speak with Vaillant.  Taking as true the facts

asserted by the non-moving party, we must assume for purposes of

this motion that Plaintiff did not tell Curry not to speak with

Vaillant or otherwise intervene.

    We find the significant distinguishing factor between the

circumstances of this case and *Neely* is that an investigation was

undertaken in *Neely* immediately after the complaint was lodged and

here no investigation was undertaken until two days after further

allegations of sexual harassment were lodged on September 6, 2009,

some nineteen days after Plaintiff's initial complaint to Curry.[12]

Defendant took *no remedial measures* regarding Plaintiff's August

20, 2009, complaint of sexual harassment, nor is there any

indication that Defendant planned to do so.  We might agree with

Defendant that the actions taken beginning on September 8, 2009, in

---

[12]   In several other cases cited by Defendant in support of the
promptness of its response, an investigation of the incident was
undertaken immediately.  *See Indest v. Freeman Decorating, Inc.*,
164 F.3d 258, 267 (5th Cir. 1999); *Cooper v. Wal-Mart Transp., LLC*,
Civ. A. No. H-08-0085, 2010 WL 2522625 (S.D. Tex. June 18, 2010);
*Foley v. Proctor & Gamble Distributing Co.*, No. Civ. A. 01-11314-
RWZ, 2003 WL 21696544 (D. Mass. July 21, 2003).

response to the September 6, 2009, complaints would be considered prompt and adequate as a matter of law *if* that were the question before us, that is, if Plaintiff had not complained to Curry of Vaillant's sexual harassment on August 20th. But this is not the case, and we cannot ignore the previous nineteen days of inactivity, particularly in light of the fact that Vaillant engaged in harassing behavior after August 20th.

Defendant's inactivity is particularly striking in light of Vaillant's employment history. We conclude a reasonable jury would not necessarily find that a nursing director took prompt action where she did nothing for nineteen (19) days after being presented with allegations of sexual harassment by a recently hired employee and the nursing director knew his record from his former employer contained two charges of sexual harassment, one of which was the cause of his discharge.[13] This conclusion is bolstered by the fact that Curry was also made aware of questionable behavior by Vaillant related to nurse Bridgette Schultz which occurred earlier in August: Carol Demcher, the fifth floor nurse manager who investigated the August 7, 2009, incident involving Schultz sent Curry a memo, and Plaintiff told Curry of the incident during their August 20, 2009, conversation. (Doc. 24 ¶¶ 16-25; Doc. 26 ¶¶ 16-

---

[13] Even if we assume that Plaintiff told Curry not to talk with Vaillant, given Vaillant's history of harassment, a reasonable jury would not necessarily conclude that liability was precluded: remedial measures other than talking with Vaillant about Plaintiff's specific complaints could have been undertaken.

25.)  Although Demcher could not confirm the reporting nurse's allegations and ultimately did not conclude that Vaillant had engaged in sexually harassing behavior (*id.*), awareness of the incident should have, at the very least, alerted Curry, SMCE's nursing director, to pay close attention to Vaillant's behavior and promptly respond to any allegation of impropriety.

Because Defendant did not respond to Plaintiff's August 20, 2009, complaint until two days after additional complaints were made by Plaintiff and two other nurses on September 6, 2009, we cannot say, as a matter of law, that Defendant provided a prompt response to the August 20th complaint.  Thus, we conclude this case presents a jury question whether Defendant's action was prompt. Therefore, Defendant is not entitled to summary judgment on Plaintiff's Sexual Harassment-Hostile Work Environment claims, Counts II and V of Plaintiff's First Amended Complaint.[14]

## 2.  Retaliation

Defendant maintains that Plaintiff's claims for retaliation under Title VII and the Pennsylvania Human Relations Act ("PHRA") cannot go forward because she cannot establish a prima facie case of retaliation and Plaintiff cannot show Defendant's proffered legitimate, non-retaliatory reasons for its actions are pretextual.

---

[14]  Plaintiff's Sexual Harassment-Hostile Work Environment claims go forward in all respects as Defendant only assumed for the sake of this motion that Plaintiff could meet the first four prongs of the relevant inquiry.  (*See* Doc. 25 at 29.)

41

(Doc. 25 at 37-52.)   We agree.

42 U.S.C. § 2000e-3(a), Title VII's retaliation provision, provides in relevant part that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation."  A retaliation claim under either Title VII or the PHRA where the plaintiff claims the defendant's stated reasons for its actions are a pretext for discrimination is governed by the three-part *McDonnell Douglas* framework.  *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Under the three-part framework, the plaintiff must first make out a prima facie case.  *See*, *e.g.*, *Moore v. City of Philadelphia*, 461 F.3d 331, 340 (3d Cir. 2006).  If the plaintiff makes her prima facie showing, the defendant then has the burden of producing a legitimate, non-retaliatory reason for its conduct.  *Moore*, 461 F.3d at 342.  The burden then shifts back to the plaintiff to show that the employer's proffered reason was false and retaliation was the real reason for the adverse action.  *Id.*  At the summary judgment stage, "a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions."  *Id.* (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

42

a.    **Prima Facie Case**

Defendant first argues that Plaintiff cannot establish the second and third elements of her prima facie case.  For the reasons discussed below, we concur.

To establish a prima facie case of retaliation, a plaintiff must show "'(1) she engaged in activity protected by Title VII; (2) the employer took an adverse action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'"  *Moore*, 461 F.3d at 341 (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).[15]

---

[15] *Moore* explained that the Third Circuit's previous formulation of the requirements of a retaliation claim are not consistent with the Supreme Court decision in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).  461 F.3d at 341.

> Until recently, we required those claiming retaliation under Title VII-like those claiming discrimination made unlawful by that provision-to show an "adverse employment action" that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997) (internal quotation marks omitted).  Employees claiming retaliation by workplace harassment, therefore, were required to show retaliatory harassment that was "severe or pervasive enough to create a hostile work environment" that would violate the anti-discrimination provision of Title VII's protection from retaliation.  *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006).

43

Defendant does not contest that Plaintiff engaged in protected activity, but maintains the second and third elements are at issue. To establish the second element, a plaintiff must show "that a reasonable employee would have found the challenged actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Moore*, 461 F.3d at 341 (quoting *Burlington Northern*, 548 U.S. at 68.) The "material adversity" requirement is intended to "separate significant from trivial harms." 548 U.S. at

> In *Burlington Northern*, . . . the Supreme Court disagreed with a formulation like the one we adopted in Robinson and *Jensen*. 126 S. Ct. at 2410 (citing *Robinson*, 120 F.3d at 1300, as an example of this standard). It found that the discrimination and retaliation provisions of Title VII have different statutory language and different purposes, and accordingly, "that the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 2412-13. Because the discrimination and retaliation provisions "are not coterminous," the Court concluded that "[t]hat the scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts or harm." *Id.* at 2414. Consistent with this view, the Court held that a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415.

*Moore*, 461 F.3d at 341.

68.  *Moore* explained that, when evaluating whether actions are materially adverse, "we must remain mindful that 'it is important to separate significant from trivial harms' because '[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." 461 F.3d at 346 (quoting *Burlington Northern*, 548 U.S. at 68).  The objective "reasonable employee" standard is important because "[i]t avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings."  *Burlington Northern*, 548 U.S. at 68-69.  *Burlington Northern* also stressed the importance of the general terms used in the standard:

> We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances.  Context matters. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale*, *supra*, at 81-82, 118 S. Ct. 998.  A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. *Cf.*, *e.g.*, *Washington*, *supra*, at 662 (finding flex-time schedule critical to employee with disabled child).  A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight.  But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's

45

> professional advancement might well deter a
> reasonable employee from complaining about
> discrimination. . . . Hence, a legal standard
> that speaks in general rather than specific
> prohibited acts is preferable, for an "act
> that would be immaterial in some situations
> is material in others." *Washington*, *supra*,
> at 661.

548 U.S. at 69.

To establish the third element of her prima facie claim, the plaintiff must show "a causal connection between the plaintiff's opposition to . . . unlawful discrimination and an action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Moore*, 461 F.3d at 341-42. *Jensen* noted that the third element "identifies what harassment, if any, a reasonable jury could link to a retaliatory animus." 435 F.3d at 449-50.

When looking at the second and third elements of a plaintiff's prima facie case, we keep in mind several general principles: "[w]hen one employee makes a charge under Title VII against another, some strain on workplace relationships is inevitable," *Jensen*, 435 F.3d at 452 (citing *Von Gunten v. Maryland*, 243 F.3d 858, 870 (4th Cir. 2001), *overruled on other grounds by Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006)); "[m]ere expressions of opinion are . . . not retaliatory," *Jensen*, 435 F.3d at 452; "Title VII prohibits retaliation against accusers, not support for the accused," *id.*; and "while we must consider the totality of the circumstances, some circumstances do not affect our

46

analysis because they are not retaliatory," *id.*  Finally, as noted

in *Moore*, our task is to "identify what materially adverse actions

a reasonable jury could link to a retaliatory animus."  461 F.3d at

346 (internal quotation omitted).

    Plaintiff first points to two adverse actions for which

"temporal proximity alone suggests . . . retaliation" (Doc. 28 at

45): on September 18, 2009, Plaintiff was advised she could no

longer work the scheduled hours she had been working; and Defendant

failed to timely provide Plaintiff with tuition reimbursement (*id.*

at 46-47).  Plaintiff also points to the following as adverse

actions in support of her retaliation claim:  SMCE management,

including Curry and Demcher, repeatedly ignored Lawrence; there

were occasions after Lawrence reported the harassment that she was

initially assigned to work on the same floor as Vaillant even

though she was given assurances otherwise; she was forced to listen

to Vaillant's taped reports on patients; when she refused to work

on the same floor as Vaillant, she was threatened with

insubordination; and Supervisor Yeager's conduct, including vulgar

language and comments about Plaintiff to other Hospital employees.[16]

_____

    [16]   As Defendant points out, noticeably absent from this
recitation is Plaintiff's assertion in her Amended Complaint that
she was retaliated against by being given inferior work
assignments.  (*See* Doc. 31 at 14 (citing Doc. 16 ¶¶ 62, 66).)
Plaintiff's failure to mention this basis for her retaliation claim
in her recitation of adverse actions she experienced or refute
Defendant's supporting brief argument that the "inferior work
assignment" basis of her retaliation claim must fail (*see* Doc. 25
at 40-42), leads us to conclude that Plaintiff's has waived this

(Doc. 28 at 47-48.)

We will now review these allegedly adverse actions in the context of the legal framework set out above.  We will look at each proffered reason independently and also, for those actions which can be considered retaliatory, we consider the whole.

i.   *Schedule Change*

Plaintiff first points to her schedule change as an adverse employment action.  (Doc. 28 at 46.)  We conclude Plaintiff has not met her burden of showing that this is an adverse employment action.

Plaintiff was notified of the change on September 18, 2009, almost one month after she lodged her first complaint on August 20, 2009, and twelve (12) days after she lodged her second complaint on August 6, 2009.  As set out in the Background section of this Memorandum, on September 18, 2009, Lisa Schetrum, patient coordinator, informed Plaintiff that, because of changes to the Kronos timekeeping system, as of October 4, 2009, Plaintiff's eight-hour shift could no longer be manually entered so as to avoid overtime.[17]  (Doc. 24 ¶ 98.)  Although Plaintiff admits that there

---

basis of her retaliation claim.

We further note that we only review those allegations upon which Plaintiff relies to defeat summary judgment of her retaliation claim, that is, those set out in the retaliation argument section of her brief (Doc. 28 at 43-48).

[17]  Schetrum's responsibilities included clinical oversight for the float pool.  (Curry Dep. 9:9-15 (Doc. 27-7 at 6).)  Her duties

were changes to the Kronos system (Doc. 26 ¶ 99), she denies that changes to the system precipitated the change in her schedule (Doc. 26 ¶ 98).  Plaintiff does not point to specific evidence in support of the assertion.  She relies only upon her recollection of what Treasure told her (*see* Doc. 26 ¶ 98)--a recollection not supported by his deposition testimony or hers.  Thus we find that no credible evidence refutes Curry's explanation for the timing and rationale behind the schedule change.[18]  In this context, Plaintiff's argument

---

in this role included performance appraisals, scheduling, and overall day-to-day management of that group of individuals.  (Curry Dep. 9:16-22 (Doc. 27-7 at 6).)

[18]   After multiple schedule changes and accommodations, Plaintiff was scheduled to work three twelve-hour shifts each week and one eight-hour shift every other week.  (Curry Dep. 84:10-85:12 (Doc. 27-7 at 24-25).)  For the week in which she worked three twelve-hour shifts and one eight-hour shift, Plaintiff would have been entitled to four hours of overtime if she had punched in the time clock.  (Curry Dep. 85:13-24 (Doc. 27-7 at 25).)  Curry could not justify paying Plaintiff overtime to accommodate her schedule so it was agreed that she would not punch in when she worked the eight-hour shift and Plaintiff would be manually credited with four-hours each week.  (Curry Dep. 85:20-86:2 (Doc. 27-7 at 25).) Initially Curry was manually entering the changes, then Schetrum took over that responsibility.  (Curry Dep. 86:5-6 (Doc. 27-7 at 25).)

Curry provided an explanation for the timing and need for the change at her deposition.  Plaintiff could no longer work the eight-hour shift every other week because of upgrades to the Kronos system which had changed the process for scheduling and putting calendars and time sheets into the system.  (Curry Dep. 103:16-104:2 (Doc. 27-7 at 29).)  Where before the schedule changes could be accomplished manually "without having anyone recognize [what] was occurring," a practice with which Schetrum was not comfortable, the changes meant that Schetrum had to "preindicate [the employee's] schedule so that it would become apparent that [Plaintiff] had an eight-hour shift that was generating overtime. That was not necessarily prior."  (Curry Dep. 110:10-24 (Doc. 27-7

that the schedule change was retaliatory hinges on her assertion that Curry was willing to violate Hospital policy before her harassment claim and not willing to do so after (Doc. 27 ¶ 161). This simplistic argument, without more, is not sufficient to meet Plaintiff's burden.

Further, we agree with Defendant that Plaintiff has not addressed the reasonable employee aspect of this claimed adverse action--a showing which is her burden. (*See* Doc. 31 at 14.)  Even, assuming *arguendo*, that Plaintiff had attempted to make such a showing, we would find that a reasonable employee would not have found Curry's and/or Schetrum's actions materially adverse.  There is no dispute that the Kronos system changes applied to all employees.[19]  (Doc. 24 ¶ 100; Doc. 26 ¶ 100.)  There is no dispute

---

at 31).)  Curry stated that with the more stringent requirements in terms of what had to be entered into Kronos "the concern would be that, you know, it would be found[] that we were altering her punch."  (Curry Dep. 104:2-6 (Doc. 27-7 at 25).)  In answer to the question of why that was a problem, Curry responded that "[i]t wasn't appropriate . . . [b]ecause it violated the Wage and Hour rules."  (Curry Dep. 104:7-12 (Doc. 27-7 at 25).)

[19]  In *Von Gunten v. Maryland*, 243 F.3d 858 (4th Cir. 2001), *abrogated in part by Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), the Fourth Circuit Court found that the plaintiff's retaliatory harassment claim failed where the claimed retaliation included the "imposition of generally applicable departmental policies."  243 at 870.  We do not rely on *Von Gunten* because the applicable standard when the case was decided was the "severe or pervasive" retaliatory harassment standard rejected by *Burlington Northern* as discussed previously in the text.  However, we note that implementation of policies which are applicable to all employees generally could not be considered materially adverse because the action would have occurred even in the absence of engagement in a protected activity so could not dissuade a

that Defendant had uniquely accommodated Plaintiff's preferred work
schedule--accommodations afforded no other employee.  (Doc. 24 ¶¶
3-7; Doc. 26 ¶¶ 3-7.)  There is no credible dispute that the
initial method of adjusting Plaintiff's schedule could not
continue.  (Doc. 24 ¶¶ 98-99; Doc. 26 ¶¶ 98-99.)  There is no
dispute that, in order for the accommodation to continue with the
Kronos system, different adjustments had to be made which
technically violated Hospital policy.  (Doc. 27 ¶¶ 158-159, 161;
Curry Dep. 104:2-12, 110:10-24 (Doc. 27-7 at 25, 31).)  There is no
dispute that Defendant remained willing to accommodate Plaintiff's
needs within policy and practical parameters.  (Doc. 24 ¶ 101; Doc.
26 ¶ 101.)  In these circumstances, we conclude that Defendant's
actions related to Plaintiff's schedule would not dissuade a
reasonable employee from making or supporting a charge of
discrimination.  In other words, a reasonable employee who had been
provided with a unique schedule to accommodate her needs would not
be dissuaded from making or supporting a charge of discrimination
because her supervisor was unwilling to continue with that schedule
where violation of Hospital policy and wage and hour rules would
become apparent because of a system change unrelated to the
employee's exercise of Title VII protected conduct.

ii.  *Tuition Reimbursement*

---

reasonable employee from making or supporting a charge of
discrimination.

Plaintiff maintains that Defendant's failure to timely provide Plaintiff with tuition reimbursement was an adverse action.  (Doc. 28 at 46-47.)  We conclude it is not proper for  Plaintiff to raise this claim for the first time in her opposition brief.

As Defendant points out, Plaintiff does not allege this basis for her retaliation claim in her EEOC charges, her Complaint, or her Amended Complaint.  (See Doc. 31 at 17.)  Because Plaintiff cannot amend her pleading through her brief responding to Defendant's summary judgment motion, *see Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008) (not precedential) (citing *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)), the tuition-reimbursement basis for her retaliation claim fails.

Defendant also argues that Plaintiff's attempted amendment substantively fails.  (Doc. 31 at 18.)  Proof of Plaintiff's grade was a prerequisite to reimbursement.  (Doc. 31 at 18.)  Plaintiff completed the class in the fall of 2009 but did not submit proof of her grade until February 19, 2010 (Doc. 28 at 47; Doc. 31 at 18), and she received reimbursement in October 2010.  Thus, her argument that she was not reimbursed "until one year later in October 2010" is both inaccurate and disingenuous.  Further, Plaintiff's argument that the failure to reimburse her tuition was an action for which "temporal proximity alone suggests . . . retaliation for her report

52

of sexual harassment . . ." is undermined by the fact that her six-month delay in providing proof of her grade eliminates her inference that she was entitled to reimbursement when she completed the course. (*See* Doc. 28 at 46-47.)  Because of these flaws in Plaintiff's presentation of her claim, as well as the fact that she does not attempt to show that a reasonable employee would have found this action materially adverse, we conclude the tuition reimbursement basis of Plaintiff's retaliation claim fails.

*iii. Supervisor Slights*

Plaintiff next complains that SMCE management, including Demcher and Curry, repeatedly ignored her.  (Doc. 28 at 47.)  Although the "Statement of Facts" portion of Plaintiff's brief provides scant information regarding supervisors ignoring her (Doc. 28 at 28), Plaintiff does not provide details regarding being "repeatedly ignored" in the argument portion of her brief, nor does she attempt to show how this conduct rises to the level of an adverse action (*id.* at 47).  Not only has Plaintiff not met her burden on this issue, but we also concur with Defendant that, as presented, we have no basis to conclude the alleged conduct amounts to anything more than the petty slights or minor annoyances that often take place at work from which Plaintiff cannot be immunized based on her decision to report discriminatory behavior. *Burlington Northern*, 548 U.S. at 68;  *Moore*, 461 F.3d at 346.

*iv.  Assignment to Work with Vaillant*

Plaintiff cites assignments to work with Vaillant as adverse actions. (Doc. 28 at 47.) Plaintiff does not provide details regarding this allegation or attempt to show how it rises to the level of an adverse action. (*Id.*) Therefore, Plaintiff has not met her burden of showing material adversity, and the claim fails. We also conclude that the record's notation of one instance where Plaintiff was initially assigned to work with Vaillant (on November 1, 2009) cannot be considered materially adverse in that when Plaintiff refused to work with him she was reassigned to the emergency room with no repercussions. (*See* Doc. 24 ¶¶ 124-127; Doc. 26 ¶¶ 124-127.) This conclusion is supported by evidence that Treasure talked with Plaintiff about setting up a group meeting to discuss accommodating her desire not to work with Vaillant (Doc. 24 ¶ 109; Doc. 26 ¶ 109) and the meeting took place on November 19, 2009 (Doc. 24 ¶ 131; Doc. 26 ¶ 131).

v.   *Vaillant's Taped Reports*

Plaintiff cites being forced to listen to Vaillant's taped reports (on November 19, 2009) regarding patients he had cared for as another instance of adverse action. (Doc. 28 at 47.) This claim fails because Plaintiff does not provide details regarding this allegation or attempt to show how it rises to the level of an adverse action. (*Id.*) Further, listening to a taped report on another floor rather than being on the same floor as Vaillant for the usual report was an accommodation to Plaintiff's desire not to

be in Vaillant's presence.  Because information about patients must be communicated from shift to shift and because there is no indication that the taped recordings were in any way improper, we conclude no reasonable employee could consider being "forced to listen to Vaillant's taped reports" to be a materially adverse action.

*vi.  Threat of Insubordination*

Plaintiff next cites being threatened with insubordination when she refused to work with Vaillant as an adverse action.  (Doc. 28 at 47.)  Again, Plaintiff provides no support for this assertion, and, therefore, this basis for her retaliation claim fails.[20]

Further, we conclude that this "threat" is not cited in its proper context according to Plaintiff herself.  (See Doc. 28 at 30).  Rather than being threatened with insubordination *when* she refused to work with Vaillant (*see* Doc. 28 at 47),  Plaintiff was told at the November 19th meeting that the Hospital would attempt to accommodate her desire not to work on the same floor as Vaillant, but that, given the small size of the facility and the needs of the nursing units, they could not guarantee that Plaintiff would never be on the same floor as Vaillant.  (Doc. 24 ¶ 132; Doc. 26 ¶ 132.)

---

[20]  Although Plaintiff's Statement of Additional Undisputed Material Facts Which Preclude Summary Judgment contains a reference to being threatened with insubordination when she refused to work with Vaillant (Doc. 27 ¶ 179), Plaintiff does not cite to any record support in her opposition brief (Doc. 28).

Plaintiff was also told that there could be potentially serious consequences if she refused to perform her assignment.  (Doc. 24 ¶ 133; Doc. 26 ¶ 133.)  When Plaintiff asked what the consequences would be, Treasure said she would be fired for insubordination. (Doc. 27 ¶ 186.)  At the same meeting, Curry offered Plaintiff a permanent position on the 6 North unit on the sixth floor of the Hospital (Doc. 24 ¶ 134; Doc. 26 ¶ 134), and Plaintiff refused that alternative (Doc. 24 ¶ 135; Doc. 26 ¶ 135).  Thus, taken in context, the "threat" was in response to a hypothetical question posed by Plaintiff at a meeting in which Plaintiff was offered other accommodations which she refused.  Significantly, Plaintiff does not take issue with Defendant's assessment of the scheduling needs of the facility.

*vii. Yeager's Conduct*

Finally, Plaintiff cites two aspects of Yeager's conduct as adverse actions: that "she was exposed to the wrath" of Yeager's vulgar language (and Defendant did not appropriately respond to Plaintiff's related complaints); and Yeager's comments to other employees which suggested she was unhappy with Plaintiff for reporting sexual harassment.  (Doc. 28 at 48.)  As with Plaintiff's other asserted adverse actions, Plaintiff does not attempt to show, as is her burden, "that a reasonable employee would have found the challenged action materially adverse."  *Burlington Northern*, 548U.S. at 68.  However, assuming *arguendo* she had done so, we will

first look at the independent actions attributed to Yeager and then at Yeager's conduct taken as a whole.

In this section of her brief, Plaintiff cites *Jensen* and *Andrews v. City of Philadelphia*, 895 F.2d 1469 (3d Cir. 1990), for the proposition that "[w]here insults directly relate to a sexual harassment complaint brought by the Plaintiff, they raise an obvious inference of retaliatory animus." (Doc. 28 at 47 (citing *Jensen*, 435 F.3d at 450; *Andrews*, 895 F.2d at 1482 n.3).) Plaintiff also posits that "even where retaliatory conduct does not occur until one year after an initial report of sexual harassment, intervening antagonism tends to show seemingly unrelated incidents were components of an integrated pattern of retaliation." (Doc. 28 at 48 (citing *Jensen*, 435 F.3d at 451 (citing *Abramson*, 260 F.3d at 288-89)).)

Plaintiff concludes that "[t]he conduct of supervisor Yeager demonstrates an obvious inference of retaliatory animus under *Jensen*." (Doc. 28 at 48.) The vulgar language of which Plaintiff complains includes the following: "[t]here was an incident in October 2009 in which Supervisor Yeager was in Lawrence's face saying, shut my F'ing mouth" (Doc. 28 at 31); and "Nurse Weicicoskie heard Yeager using curse words screaming in Lawrence's face, saying she was "f-ing and things are going to be done her way" (*id.*). Additionally, Plaintiff contends Demcher took no action when she reported the incident where Yeager yelled at

57

Plaintiff in October 2009, and neither Curry nor Treasure took any action after they became aware that Yeager used obscene language in front of Plaintiff at the nurse's station.  (Doc. 28 at 31.)

Plaintiff's first instance of the use of vulgarity is not consistent with the record.  Plaintiff testified she was told by other nurses that Yeager "was on the floor telling other nurses that she was in my face telling me to shut my F-ing mouth. . . . And I had said that never happened, that never took place.  I had no idea what they were talking about.  (Lawrence Dep. 313:8-10, 18-20 (Doc. 27-3 at 21).)  Thus, although Plaintiff now maintains that "Yeager was in Lawrence's face saying, shut my F'ing mouth" (Doc. 27 ¶ 192 (citing  Lawrence Dep. 312:22-313:20, 314:11-15; Doc. 28 at 31), Plaintiff did not testify, nor does the record otherwise support, that the incident actually happened.  (*See* Lawrence Dep. 312:22-314:10 (Doc. 27-3 at 21-22).)  Because Plaintiff's testimony and her current version of events are far different, we will not further discuss the version of events set out in the deposition testimony because Plaintiff presents no argument as to the event as reported there.  Further, because there is no credible evidence to support the October 2009 event as set out in Plaintiff's brief, this basis for her retaliation claim does not warrant further consideration.

We also conclude Plaintiff's assertion that Yeager "used obscene or vulgar language at a nurse's desk in front of Lawrence"

58

does not support a finding that the alleged incident constitutes an adverse action as Plaintiff neither claims nor infers that the language was directed at her.[21]   The mere use of language deemed inappropriate by a plaintiff, where that language is not directed at the plaintiff, would not "dissuade[] a reasonable worker from making or supporting a cause of discrimination." *Burlington Northern*, 548 U.S. at 68.   Similarly, Curry's alleged failure to react appropriately to information about Yeager's language (Doc. 28 at 31) does not evidence a retaliatory motive where Curry had no information that the language was directed at Plaintiff.

We turn now to Plaintiff's assertion that "Yeager made comments to other hospital employees which suggests that she was unhappy with the fact that Lawrence reported sexual harassment by an SMCE nurse."   (Doc. 28 at 48.)   Plaintiff cites a previous section of her brief where she sets out details of Yeager's comments to other employees, including the following: 1) in the presence of nurse Weicicoskie she told a male nurse, Josh Lecht, not to be alone with Plaintiff because she would get him in trouble (Doc. 28 at 32); 2) Weicicoskie also heard her say to Lecht that Plaintiff had ruined her Christmas, that she had to be called in on

---

[21]   The record contains evidence that Yeager's mode of communication and use of foul language was not restricted to the incident cited by Plaintiff and at times was specifically directed at individuals other than Plaintiff. (*See* Weicicoskie Dep. 56:4-57:8, 84:24-85:10 (Doc. 27-11 at 16, 23).)   This general behavior belies a retaliatory motive toward Plaintiff.

her night off to be questioned about things that had happened between herself and Plaintiff, and "the sexual harassment thing that Sharon Lawrence is going through is bull crap, and she didn't believe it" (*id.*); 3) she made comments to other staff members that she should "keep her personal life out of here" (*id.*); 4) Weicicoskie told Curry that Yeager was talking on the floor openly about Plaintiff's business and she didn't appreciate it (*id.*); 5) Plaintiff reported to Schetrum "what various retaliatory actions taken by Yeager had done to her," asked Schetrum "how many opportunities does she get to do this to me?" and Schetrum replied that "every time this was done" she reported it to Curry (*id.* at 32-33); and 6) in December 2010, Plaintiff received information that Yeager had told another nurse, Diane Barlow, not to lay her head down on the table "when Sharon Lawrence is working because she will report you for sleeping and try to have you fired" (*id.* at 33).

Even if taken as true that Yeager "was unhappy with the fact that Lawrence reported sexual harassment by an SMCE nurse" (Doc. 28 at 48), the test for an adverse action is material adversity--a supervisor's subjective assessment of the claim is not relevant unless, as a result of the supervisory's subjective feeling, she subjects Plaintiff (or causes her to be subjected) to conduct that would dissuade a reasonable worker from complaining about sexual harassment.  Plaintiff herself was not insulted, demeaned or

criticized for complaining of sexual harassment.  If the conversation with Lecht or the comment made to Barlow are taken as true, they were not made in Plaintiff's presence, nor is there any indication that Yeager wanted her comments to be disseminated.  The story related by others that Yeager falsely indicated she had argued with Lawrence and directed vulgar language at her did not make any reference to her sexual harassment claim.  (Doc. 24 ¶ 120; Doc. 26 ¶ 120.)  The record shows that Yeager was a talker who at times used vulgar language and others had problems with her behavior.  (*See*, *e.g.*, Weicicoskie Dep. 52:20-53:2, 56:4-57:8, 83:15-85:10 (Doc. 27-11 at 15, 16, 23).)  If Yeager was unhappy with Plaintiff, she also expressed negative feelings about Vaillant, Weicicoskie reporting "[s]he said things like he was a red flag and never should have been hired."  (Weicicoskie Dep. 53:3-9 (Doc. 27-11 at 15).)

Though Yeager's workplace language may have been distasteful, unprofessional, and definitely not the hallmark of good leadership, we cannot agree with Plaintiff that the evidence shows Yeager's comments and conduct "demonstrate an obvious inference of retaliatory animus."  (Doc. 28 at 48 (citing *Jensen*).)  In both *Jensen* and *Andrews*, insults were almost exclusively made directly to the plaintiffs or within earshot. 435 F.3d at 447; 895 F.2d at 1472-76.  In *Jensen*, the cumulative nature of the conduct directed against the plaintiff (regular insults over a nineteen-month period

and being the victim of physically threatening behavior and vandalism) was the basis for the finding of retaliation.  435 F.3d at 451.  This is not a case where, as Plaintiff claims, the insults directly relate to her sexual harassment claim (*see* Doc. 28 at 47 (citing *Jensen*, 435 F.3d at 450; Andrews, 895 F.2d at 1482 n.3).) Therefore, they are lacking the "obvious inference of retaliatory animus" which Plaintiff claims based on *Jensen* and *Andrews*.

Here the few instances of Yeager's allegedly retaliatory conduct cited by Plaintiff occurred over more than a one-year period and, taken independently or together, do not exhibit the material adversity necessary to make out Plaintiff's prima facie case.  Other courts have found that a supervisor's degrading and unprofessional remarks to others "cannot be retaliatory under Title VII because statements, on their own, are not likely to 'deter a person of ordinary firmness.'"  *Middleton v. Deblasis*, 844 F. Supp. 2d 556 (E.D. Pa. 2011) (quoting *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (holding that admonishments, deemed "harassment" by plaintiff, were not sufficient to constitute retaliation in the First Amendment context, in which the same standard applies (citation omitted))).[22]  Similarly, courts have held that a supervisor can criticize a subordinate and it will not be actionable absent evidence of retaliatory animus.  *See McKinnon v.*

---

[22]  The reported *Middleton* case contains no internal pagination.  Therefore, we are unable to cite the page on which the quoted material appears.

*Gonzales*, 642 F. Supp. 2d 410, 432 (D.N.J. 2009) (citing *Lillie v.*

*Chartwells*, No. 04-5453, 2007 WL 951900, at *8 (N.D. Ill. Mar. 26,

2007) (listing cases)); *see also Ferguson v. Deptford Tp.*, Civ. No.

06-2112, 2008 WL 5401630, at *5 (D.N.J. Dec. 22, 2008).  Yeager's

stray remarks about Plaintiff to others and her use of vulgar

language may have caused unnecessary tension at SMCE and distressed

Plaintiff, but the record shows Yeager's conduct is best

characterized as contributing to "the ordinary tribulations of the

workplace" which are to be filtered out in the materiality prong of

the prima facie case, 548 U.S. at 68.  Other employees did not like

the way she treated people, talked about people and used vulgar

language. (*See*, *e.g.*, Weicicoskie Dep. 56:4-57:8, 83:15-85:10

(Doc. 27-11 at 15, 16, 23).)  Importantly, this behavior related to

others as well as Plaintiff.  (*Id.*)  Whether considered an abrasive

person or equal opportunity offender, these negative character

traits do not render Yeager's conduct materially adverse in the

Title VII retaliation context.[23]

---

[23]  In keeping with the Supremre Court's caution that Title VII
is not a general civility code for the workplace, *Burlington
Northern*, 548 U.S. at 57, commentary expressed in another legal
context aptly sums up the idea that exposure to a certain amount of
undesirable conduct is a normal part of life.

> The rough edges of our society are still
> in need of a good deal of filing down, and in
> the meantime plaintiffs must necessarily be
> expected and required to be hardened to a
> certain amount of rough language, and to
> occasional acts that are definitely
> inconsiderate and unkind. There is no

*viii.   Totality of Adverse Actions*

Though Plaintiff does not do so specifically, to the extent she would argue that all of the cited adverse actions, taken together, were components of an integrated pattern of retaliation (or constitute material adversity), her argument would fail.  We have reviewed each allegedly adverse action argued to be supportive of her claim (*see* Doc. 28 at 45-48), and, given the nature and timing of each in addition to the period of time over which the allegedly adverse conduct was spread, Plaintiff has not presented evidence from which a reasonable factfinder could conclude a reasonable worker would have been dissuaded from making or supporting a charge of discrimination.

In reviewing the "overall scenario" as is required, *see Moore*, 461 F.3d at 346, here that scenario includes Defendant's accommodations to Plaintiff, including schedule adjustments, allowing her to take report by listening to a tape on another floor, not scheduling Plaintiff to work with Vaillant after he received his final warning other than on one occasion on which Plaintiff was was scheduled to work with Vaillant and her assignment was changed.

---

occasion for the law to intervene in every case where some one's [sic] feelings are hurt.

Restatement (Second) of Torts § 46 comment *d*.

We do not dispute that Plaintiff's reaction to Vaillant's conduct made her very upset and hypervigilant about her safety. (*See* Doc. 27 at 137; Lawrence Dep. 175:15-176:13 (Doc. 27-2 at 16).)  From Plaintiff's own report of her mental and emotional state following Vaillant's conduct (*id.*), it follows that her sensitivity to her coworkers' and supervisors' behavior would be heightened.  However, our inquiry is not concerned with Plaintiff's subjective perspective, but rather with that of the reasonable worker.  Here, the record does not show that others who worked with Vaillant were concerned for their safety after he received the final warning.  The record specifically shows that another nurse who had been the subject of Vaillant's harassing conduct did not want to file an EEOC charge despite Plaintiff's urging that she do so and stated she was comfortable with the Hospital's response to Vaillant's conduct.  (Doc. 24 ¶ 129; Doc. 26 ¶ 129.)  Thus, this is a case where Plaintiff has proffered no evidence, nor does our review of the record find any, that actions perceived as retaliatory by Plaintiff would have been characterized as such by a reasonable employee faced with the same or similar circumstances.

**b.   Defendant's Explanation and Pretext**

Although we have concluded that Plaintiff has not made out her prima facie case of retaliation, we will proceed with a limited discussion of the second and third prongs of the *McDonnell Douglas* analysis.  Because *Burlington Northern* specifically noted that a

schedule change could be a materially adverse action in some circumstances, 548 U.S. at 69, in an abundance of caution, we will assume *arguendo* that Plaintiff made out her prima facie case as it relates to the schedule change basis of her retaliation claim.  For the reasons discussed below, we conclude a reasonable jury could not find that Plaintiff has shown sufficient evidence to refute Defendant's articulated non-discriminatory reasons for the allegedly retaliatory schedule change.

As set out above, at the first stage of the *McDonnell Douglas* analysis, the plaintiff makes her prima facie showing, at the second stage the defendant then has the burden of producing a legitimate, non-retaliatory reason for its conduct.  *See, e.g., Moore*, 461 F.3d at 342.  At the third stage, the burden shifts back to the plaintiff to show that the employer's proffered reason was false and retaliation was the real reason for the adverse action. *Id.*  At the summary judgment stage, "a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions."  *Id.* (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).  As stated in *Fuentes*,

> to defeat summary judgment when the defendant
> answers the plaintiff's prima facie case with
> legitimate, non-discriminatory reasons for
> its action, the plaintiff must point to some
> evidence, direct or circumstantial, from
> which a factfinder could reasonably either
> (1) disbelieve the employer's articulated
> legitimate reasons; or (2) believe an
> invidious discriminatory reason was more
> likely than not a motivating or determinative

66

cause of the employer's action.

32 F.3d at 764.  Considering the quantum of evidence required to defeat summary judgment, *Fuentes* explained the proper middle ground.

> We can reject out of hand the two extreme positions: that the plaintiff can avoid summary judgment simply by arguing that the factfinder need not believe the defendant's proffered legitimate explanations on the one hand, or that the plaintiff must adduce evidence directly contradicting the defendant's proffered legitimate explanations on the other.  The correct solution lies somewhere in between: to avoid summary judgement, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reasons is a pretext).

*Id.* (internal citations omitted).

Here Defendant has come forward with a legitimate, non-discriminatory reason for the schedule change, that is, a change/upgrade in the Kronos timekeeping system which made it no longer possible to manually entered her time--a practice which had been done previously to accommodate her desired and unique schedule.  (Doc. 25 at 51.)  Defendant adds that the changes were applicable to everyone at the Hospital and, rather than being singled out, the only reason Plaintiff had to move a few hours is that she was the only member of the nursing staff with the schedule which required a manual entry.  (*Id.*)

67

Plaintiff provides two bases for finding the proffered reason pretextual in her opposition brief. (Doc. 28 at 46.) Plaintiff states that when she told Human Resources Director Treasure about the change, he responded that "it sounds like retaliation, at the same time indicating the new billing system had been in place since June 2009." (Doc. 28 at 46.) As evidence of pretext, Plaintiff also points to the fact that Curry never went to anyone in Human Resources to see if there was any other way of scheduling so Plaintiff could maintain the schedule she had before the change. (*Id.*)

Pointing to the "undisputed" facts that the upgrades meant the manual entry of some of Plaintiff's time could not continue and the Kronos system changes applied to all Hospital employees, Defendant contends that "Plaintiff resorts to playing word games with the record" having to do with whether Treasure stated there was a *new* billing system or a *change* in the billing system. (Doc. 31 at 16.)

Having carefully reviewed the relevant portions of the record, we conclude that Plaintiff asked Treasure about whether a *new* billing system would have necessitated changes to her schedule, not whether *changes* to the billing system required the adjustment. (Lawrence Dep. 188:14-23 (Doc. 27-2 at 19).) If not intentionally misstated, the distinction between a change in the system or a new system (which is significant here) is far from clear in Plaintiff's references to the issue and, in some instances, her

68

characterization does not square with her deposition testimony.
For example, in Plaintiff's Response to Defendant's Statement of
Material Facts (Doc. 26) Plaintiff denied the averment that
Schetrum informed her on September 18, 2009, that, because of
*changes* to the Kronos timekeeping system, as of October 4, 2009,
her eight-hour shift could no longer be manually entered "because
Treasure advised Plaintiff that there was no *change* in the new
billing system which would necessitate a scheduling change for
Lawrence." (Doc. 26 ¶ 98.) Similarly, in the background section
of her response brief, Plaintiff states she believes the schedule
change was retaliation because "Treasure denied being aware of any
change in the new billing system which would necessitate a schedule
change." (Doc. 28 at 27.) In contrast, in the argument section of
her brief, Plaintiff states that Treasure stated "the new billing
system had been in place since June 2009." (Doc. 28 at 46.) This
last iteration of Treasure's statement regarding the billing system
accurately reflects Plaintiff's testimony on the subject at her
deposition. (Lawrence Dep. 188:14-23 (Doc. 27-2 at 19).) Thus,
Treasure's reported response is not evidence that Defendant's
proffered reason--that a *change* in the timekeeping system was
responsible for the need for the schedule adjustment--is a *post hoc*
fabrication or did not motivate Defendant's action.

Plaintiff's reliance on Curry's failure to go to HR to see if

69

her schedule change could continue is also deficient.[24]  (Doc. 28 at

46.)  As discussed previously in Section II(B)(2)(a)(i), the

evidence shows the change to the Kronos system precluded Schetrum

from entering Plaintiff's schedule as she had done previously;

Schetrum, who did Plaintiff's schedule, informed Plaintiff of the

need for a change; and Plaintiff points to no evidence which

suggests that she asked either Schetrum or Curry to go to HR to see

if there was any way her accommodation regarding the split four

hours could be continued.  This scant evidence, particularly when

considered in context, cannot meet Plaintiff's burden of coming

forward with evidence from which a reasonable factfinder could

disbelieve Defendant's articulated reason for its action or believe

the articulated reason did not motivate its action.

     For all of the above reasons, we conclude that Plaintiff has

failed to meet her burden of showing that a reasonable factfinder

could find the reasons proffered by Defendant pretexual.

Therefore, even if Plaintiff were to have made out a prima facie

claim of retaliation based on her schedule change, Defendant would

---

     [24]  With this assertion, Plaintiff is essentially arguing it
was retaliatory for Defendant not to figure out a way to allow
Plaintiff to continue to work thirty-six hours one week and forty-
four hours the other week of a two-week pay period when the
timekeeping system change would not allow the previous
accommodation of her unique schedule to continue.  As noted in the
textual discussion of Plaintiff's prima facie case, Defendant
continued all other previously provided schedule accommodations,
including allowing Plaintiff to work twelve-hour shifts instead of
the normal eight-hour shifts and special weekend considerations.

be entitled to summary judgment on her retaliation claims.

## 3.  __Constructive Discharge__

Defendant contends that Plaintiff cannot maintain her claims for constructive discharge.  We agree.

"Constructive discharge occurs when an 'employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'"  *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 n.4 (3d Cir. 2006) (quoting *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 887 (3d Cir. 1984)) (alternation in *Spencer*).  *Spencer* also explained that

> [a] hostile work environment "will not always support of a finding of constructive discharge."  *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 28 (1st Cir. 2002).  "To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment."  *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992), *aff'd*, 511 U.S. 244.

*Spencer*, 469 F.3d at 317 n.4.

Plaintiff rests her constructive discharge claim on the "entirety of circumstances following Plaintiff's report of sexual harassment on August 20, 2009" and specifically points to the actions relied upon for her retaliation claim, adding a few comments not cited in connection with that claim.  (*See* Doc. 28 at 51-52.)

The record shows that Plaintiff was not subject to Vaillant's

harassment at least from October 2009 through the end of her employment in January 2011.  We have concluded that Plaintiff's claimed retaliatory actions considered cumulatively do not support her retaliation claim.  The additional comments Plaintiff cites in support of her constructive discharge claim (Doc. 28 at 51-52), considered in context (*see* Doc. 31 at 24-25), do not constitute evidence upon which a reasonable factfinder could convert her failed retaliation claim into a successful constructive discharge claim.  Therefore, Plaintiff's resignation purportedly in response to the events following her first report of harassment does not meet the constructive discharge standard, one which is viewed objectively from the perspective of the reasonable employee.  This conclusion is bolstered by the fact that Plaintiff submitted her letter of resignation on January 14, 2011--just three days after she received a work assignment which she claimed to be "inferior," an assignment which served as a basis for her retaliation claim in her second EEOC charge and Amended Complaint.  (Doc. 24-3 at 158-60; Doc. 16 ¶¶ 62, 66.)  This is particularly significant because Plaintiff abandoned this basis for her retaliation claim in response to Defendant's summary judgment motion.  (*See supra* n.16.)

**4.   Discrimination Based on Sex**

Finally, Defendant asserts that Plaintiff's claims for sex discrimination must fail because she sets forth no facts to support these claims.  (Doc. 25 at 52.)  We conclude Plaintiff has failed

to sufficiently support her sex discrimination claims.

In response to Defendant's argument that the "boilerplate allegations" found in her First Amended Complaint do not suffice (Doc. 25 at 52 (citing Doc. 16 ¶¶ 76, 88)), Plaintiff avers that her sex discrimination claims are supported by *Jensen* where the court concluded:

> As an abstract matter, retaliation against a person based on the person's complaint about sexual harassment is not necessarily discrimination based on the person's sex. If the individuals carrying out the harassment would have carried out a similar campaign regardless of the person making the complaint, the harassment, while actionable as illegal retaliation, would not be actionable as discrimination based on sex. In reality, however, when a woman who complains of sexual harassment is thereafter subjected to harassment based on that complaint, a claim that harassment constituted sex discrimination (because a man who made such a complaint would not have been subjected to similar harassment) will almost always present a question that must be presented to the trier of fact. In such a situation, the evidence will almost always be sufficient to give a reasonable inference that the harassment would not have occurred if the person making the complaint were a man. The difficult task of determining whether to draw such an inference in a particular case is best left to trial.

*Jensen*, 435 F.3d at 454; (Doc. 28 at 50). On the basis of this discussion in *Jensen*, Plaintiff avers that "here, where Lawrence who complained about sexual harassment is thereafter subjected to harassment based on her complaint, the issue of whether the reasonable inference that the harassment would not have occurred if

73

the person making the complaint were a man must be presented to the trier of fact."  (Doc. 48 at 50.)

The crucial distinction between *Jensen* and the case at bar is *Jensen* found that a reasonable jury could find the harassment to which the plaintiff was subjected after the initial incident to be retaliatory.  435 F.3d at 454.  Here, we have found that Plaintiff has not produced evidence from which a reasonable jury could conclude that the actions Plaintiff cites as adverse satisfy the material adversity standard required to support her retaliation claim.  Based on this conclusion, the proffered basis for Plaintiff's sex discrimination claim is without merit and Defendant is entitled to summary judgment on Plaintiff's sex discrimination claims.

### III. Conclusion

For the reasons discussed above, we conclude Defendant's Motion for Summary Judgement (Doc. 23) is properly granted in part and denied in part.  The motion is denied as to Counts II and V, Plaintiff's claims for Sexual Harassment-Hostile Work Environment under Title VII and the PHRA.  The motion is granted in all other respects and judgement in Defendant's favor is granted on the following counts: Counts I and IV for Sex Discrimination under Title VII and the PHRA; and Counts III and VI for Retaliation under Title VII and the PHRA.  Therefore, only Plaintiff's claims for Sexual Harassment-Hostile Work Environment go forward.  An

appropriate Order is entered simultaneously with this Memorandum.


                                        S/Richard P. Conaboy
                                        RICHARD P. CONABOY
                                        United States District Judge

DATED: August 14, 2012 _____